THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.* KENNETH EDGAR BRETT, Defendant-Appellee.

First District (2nd Division)   No. 82—1688

Opinion filed February 28, 1984.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Bruce A. Cardello, and Edward A. Stephens, Assistant State's Attorneys, of counsel), for the People.

David S. Mejia, of Chicago, for appellee.

JUSTICE DOWNING delivered the opinion of the court:

This is an appeal by the State from an order suppressing evidence (cocaine) obtained as a result of an allegedly unlawful warrantless search of defendant's person at O'Hare International Airport on December 1, 1981. The trial court found defendant submitted to a search of his person because he felt he had no alternative but to submit to authority and that this constituted a seizure within the meaning of the fourth amendment. On appeal, the State contends defendant unequivocally and unhesitatingly consented to a search of his luggage and his person after being informed that he was not under arrest, and that he could have declined if he chose.

Although defendant has not filed an appellee's brief, this does not prevent our considering the merits of the State's position. *First Capitol Mortgage Corp. v. Talandis Construction Corp.* (1976), 63 Ill. 2d 128, 345 N.E.2d 493.

Robert Fulkerson, a special agent of the Federal Drug Enforcement Administration (DEA), testified that on December 1, 1981, at approximately 11:45 a.m., he observed defendant and another man, Peter J. Konczal, deboard Northwest Airlines flight No. 701 from Fort Lauderdale, Florida. Fulkerson had earlier spoken with Detective Tom Brennan of the Broward County sheriff's police by telephone. Brennan had described two men he had under surveillance at the Fort Lauderdale airport, traveling under the names Mr. Brett and Mr. Kirk (Konczal). Fulkerson was advised that the men had paid cash for their tickets from a large amount of money Konczal had, and the men appeared to be "nervous."

Fulkerson then followed the men and overheard that they were changing their flight from a 1 p.m. departure to a noon departure to Milwaukee, and he heard a ticket agent assure them that their baggage would be on the earlier flight. When Konczal exited the deboarding area, two Chicago police officers with whom Fulkerson was working, Boile and Turney, approached Konczal and conversed with him. Fulkerson then approached defendant, identified himself as a Federal officer and then asked to speak to him; defendant agreed. He then informed defendant he was not under arrest but not expressly told that he was free to go or that he was free not to talk to him.

Fulkerson asked Brett for identification. As Agent Grassman joined them, defendant displayed a Virginia driver's license in his name. When Fulkerson asked defendant about an airline ticket, defendant replied that Konczal had it. He did not inform defendant that he did not have to show him his driver's license or his airline ticket. Fulkerson obtained defendant's ticket from Konczal and asked defendant if he still lived in Virginia. Defendant said he had no regular residence, that he traveled and that he was a welder at one time but was presently unemployed. After returning defendant's driver's license and airline ticket to him, Fulkerson told defendant he was not under arrest but asked him if he was carrying any drugs. When defendant said "no," Fulkerson asked defendant if he would consent to a brief voluntary search of his suitcase and person, that he would not miss his flight, and that he could decline if he so chose. Defendant told him to go ahead.

With Fulkerson leading the way, he and defendant then walked about 50 feet to a stairway and down the stairway to a small area. Officers Turney and Boile, Agent Grassman and Konczal were also present. There defendant opened his suitcase but nothing incriminating was found. Fulkerson then asked defendant if he was carrying any drugs on his person. Defendant answered "no" and raised his arms parallel to the floor apparently to allow a search of his person. Fulkerson felt a large lump in each boot as he patted down the outside of defendant's blue jeans and asked defendant what the bulges were. Defendant hesitated, sighed and stated "a pound." Fulkerson then arrested defendant and from each boot removed two clear packages containing a white-powdered substance.

Defendant testified that at approximately 8 a.m. on the date of his arrest, he was at the Florida airport with Konczal. Both he and Konczal paid cash for their tickets. When he got off the airplane in Chicago, he walked across the concourse to catch a connecting flight for Milwaukee. He had never been to O'Hare airport before and had never been approached by law enforcement agents in a public place or interrogated. After changing his flight to a noon departure, he and Konczal left the immediate boarding area, and Konczal went to get a drink of water. At that time defendant observed two men talk to Konczal.

Agent Fulkerson then approached, identified himself as a Federal agent, showed him a badge and according to defendant stood directly in front of him. Because defendant's back was to a small railing, defendant said he was blocked. Defendant denied that Fulkerson told him at any time that he was free to go, and if Fulkerson had told

him, he would have left for his flight. Another officer then came up and asked defendant for identification. After defendant showed his driver's license, he was asked for his ticket and responded that Konczal had it. When defendant told Fulkerson his flight was leaving in just a few minutes, Fulkerson responded that defendant looked like someone who might be carrying drugs, and he wanted to inspect defendant's luggage. Defendant admitted that he might have said "[g]o ahead and search my luggage" because he believed that he had no choice and did not know what he was doing. But defendant denied that Fulkerson expressly told him that permission for a search of his luggage was voluntary and he could decline if he wished. Rather Fulkerson only asked for his consent to a search of his luggage, and he told him to do so thinking he had no choice. Defendant recounted that, as Fulkerson left and went to his luggage, defendant heard something to the effect of "arrest," but he was not sure if the officer told him he was not under arrest.

The agents then "walked him" about 80 feet down the concourse to a stairway which they descended to a place where his baggage was to be searched. During this time there was an agent in front of him leading the way and an agent behind him. Defendant claimed that he followed because he was under the impression that he had no choice but to cooperate. Officer Fulkerson and four other agents or policemen were also present where the luggage was searched after defendant helped open a suitcase which had a defective catch. When Fulkerson had gone through the suitcase, he approached defendant and asked if he was carrying any drugs. Defendant stood up, said "no," and raised his hands to his waist as Fulkerson started patting him down from under this arms to his pants legs and boots where the "pound" was discovered.

Chicago police officer James Turney was present when the defendant was searched. He saw defendant standing with his hands extended out from the body slightly higher than shoulder length. He heard Officer Fulkerson say "what's that," and defendant respond "a pound."

DEA agent Milo Grassman testified he was present when Fulkerson advised defendant he was not under arrest; this was at the time he returned defendant's airline ticket and driver's license to him. Fulkerson then asked defendant if he could search his luggage and his person and stated to defendant that it would be strictly voluntary because defendant would not have to consent to it. Defendant responded, "[G]o ahead if you want to."

In granting the motion to suppress, the trial court concluded that

the information available to the officers, although it did establish that defendant met the "drug courier profile," was not sufficient, standing alone, to justify a seizure.

The State maintains there was no seizure, only an "encounter" with defendant, who then consented to a search of his person. For, as the State points out, law enforcement authorities may legitimately approach a deboarding airline passenger and ask him questions provided the passenger's freedom is not restrained. *Florida v. Royer* (1983), 460 U.S. 491, 497, 75 L. Ed. 2d 229, 236, 103 S. Ct. 1319, 1324; *People v. Long* (1983), 99 Ill. 2d 219.

The trial court here found that the original encounter between Fulkerson and defendant was not a "seizure," but merely an "encounter" and that the agent's actions in requesting and examining defendant's license and his airline ticket were not constitutionally impermissible. However, the trial court found the officers exercised control over defendant after they had examined and returned his identification and airline tickets, and that when defendant gave permission to Fulkerson to search his luggage, this was more a concession to authority than consensual.

■ A trial court's finding on a motion to suppress will not be disturbed unless it is manifestly erroneous. (*People v. Reynolds* (1983), 94 Ill. 2d 160, 445 N.E.2d 766.) In *Terry v. Ohio* (1968), 392 U.S. 1, 16, 20 L.Ed. 2d 889, 903, 88 S. Ct. 1868, 1877, the court observed that a seizure occurs whenever a police officer accosts an individual and restrains his freedom to walk away. In *People v. Kiser* (1983), 113 Ill. App. 3d 501, 504, 447 N.E.2d 858, agents blocked defendant's exit onto an escalator. The court concluded defendant was not free to ignore his interrogator and walk away, and that continuing questioning by the officers was in reality a stalling technique aimed at detaining defendant until the officers could obtain more information.

■ In this case the defendant's consent followed the initial encounter and came after the investigating officer in authority had returned his airline ticket and identification to him. We conclude that by these actions the officer effectively communicated to defendant that he was satisfied with defendant's answers and his identification. A reasonable person in defendant's position under like circumstances could have considered he was not being detained but was free to go.

We do not consider that *People v. DeLisle* (1982), 104 Ill. App. 3d 297, 300, 432 N.E.2d 954, dictates a contrary result, for it was decided after *United States v. Mendenhall* (1980), 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870, but before *Royer*. The *DeLisle* court refused to follow Justice Stewart's opinion on the seizure issue in

*Mendenhall* because only one other justice had concurred. In *Florida v. Royer*, however, a majority of the justices agreed with Justice Stewart's formulation in *Mendenhall*. See *Florida v. Royer* (1983), 460 U.S. 491, 502, 75 L. Ed. 2d 229, 239, 103 S. Ct. 1319, 1326 (plurality opinion), 1332-33 (Blackmun, J., dissenting).

The record reveals that both DEA agents testified defendant gave his consent to search after the officer had returned defendant's airline ticket and his identification to him. Defendant's testimony is not conflicting on this point. Both agents' testimony also supports the finding that Fulkerson informed defendant he was not under arrest as he returned his tickets and identification. As the trial court pointedly remarked, defendant's version did not contradict this; in fact, defendant recalled the term "arrest" being mentioned and practically conceded the accuracy of the agents' version of what was said. The trial court, nevertheless, found that, subjectively, defendant, as he testified, was under the impression that he had no choice but to cooperate with the agents at this point. Where we differ with the trial court is that we find that, objectively, defendant was not required to cooperate further.

While Fulkerson had defendant's ticket and identification, we would agree that defendant was, objectively speaking, momentarily immobilized, at least to the extent that he could not board his flight without his ticket. The trial court found that the agents' actions were not unlawful up to this point, and we agree on the authority of *Florida v. Royer* (1983), 460 U.S. 491, 502, 75 L. Ed. 2d 229, 239, 103 S. Ct. 1319, 1326. Fulkerson then returned defendant's ticket and identification to him, but requested that defendant accompany him downstairs for a search of his luggage. Although defendant could have refused, he agreed. Defendant's belief that he was not free to go was unreasonable. *Cf. United States v. Mendenhall* (1980), 446 U.S. 544, 554, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877.

Fulkerson's asking defendant for permission was consistent with defendant's freedom to leave. We see no impropriety in the officer turning to defendant, as a last resort, to ask defendant for his permission to search, and we conclude that going downstairs was mutually agreed on between defendant and Fulkerson. We also judge defendant's consent to the luggage search was not rendered involuntary by his apparent ignorance of his right to refuse. (See *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 234, 36 L. Ed. 2d 854, 867, 93 S. Ct. 2041, 2051.) Defendant's actions in following the agents do not establish that he was the subject of a seizure for fourth amendment purposes. Defendant's consent to the subsequent pat-down search, therefore, was not tainted by the events which had preceded it.

Defendant's subjective belief did not invalidate the otherwise lawful actions of the agents who took defendant at his word when he consented to a search of his suitcase and then accompanied them to the baggage area. We likewise consider defendant's subjective beliefs did not invalidate the pat-down search, to which he then also consented.

Therefore, the judgment of the circuit court of Cook County is reversed.

Reversed.

STAMOS and PERLIN, JJ., concur.