UNITED STATES of America

v.

Robin NURSE.

Crim. No. 89–0150.

United States District Court, District of Columbia.

July 10, 1989.

Eva Polin, Asst. U.S. Atty., Washington, D.C., for U.S.

Kenneth Mundy and Robert Mance, Washington, D.C., for defendant.

## MEMORANDUM

JACKSON, District Judge.

The defendant Robin Nurse moved to suppress the more than four kilograms of cocaine and "crack" found in her possession on April 14, 1989, which lead to her indictment on charges of possession of narcotics with intent to distribute. She also sought to suppress inculpatory post-arrest statements she made in the presence of, or in response to questions by, the police. The motion was denied orally from the bench following hearing on July 5, 1989, and defendant has since entered a conditional plea of guilty pursuant to Fed.R. Crim.P. 11(a)(2). This Memorandum is filed in aid of appellate review.[1]

### I.

Robin Nurse, a 27–year old New York resident, arrived by train from New York City at Union Station, in Washington, D.C., at approximately 12:15 a.m., April 14, 1989, carrying a "tote bag" and a pocketbook. Various of her mannerisms attracted the attention of Sgt. John Brennan, an 18–year veteran of the Metropolitan Police Department and the officer-in-charge of the Department's Narcotics Interdiction Unit at Union Station. Sgt. Brennan followed Nurse's passage through the station to the taxicab stand outside and overheard her tell the dispatcher she wanted a cab to "First Street, N.W." He approached Ms. Nurse, employing the Unit's now-familiar technique,[2] introduced himself and had her confirm that she had arrived from New York. He asked her for identification, in response to which she produced a commercially available "identification card" representing her to be a 19–year–old named "Shawna Green." (Sgt. Brennan did not then, of course, know that that information was false.) She had come to Washington, Nurse said, to visit a friend named "Sheree." She could not say how long she had known "Sheree." Told by Sgt. Brennan that he suspected her of transporting drugs, she denied it.

Ms. Nurse appeared to Sgt. Brennan to be extraordinarily nervous, shifting her weight from foot to foot, and looking about her without meeting his gaze. He asked her for permission to look in her tote bag. She responded, "My bag?" He said yes. She refused. He then asked if she were willing to let a narcotics-detecting canine sniff the bag. That, too, she declined, say-

---

1. The case is stated on the basis of the evidence taken on July 5, 1989. To the extent of any material discrepancies between the accounts given by the police officers and Ms. Nurse, the Court credits the officers' versions.

2. A single officer, in plain clothes, with no weapons visible, approaches a subject, and speaking in a normal tone of voice, identifies himself, displays credentials, and asks the subject if he or she will answer questions. (Other officers are, however, in the vicinity.) The subject is free to refuse, or to ignore him, and is also free to depart, but is not so advised.

ing that if she were not under arrest she wanted to go. Sgt. Brennan announced that she was free to leave, but he intended to detain the bag for a canine sniff, and he gave her his name and a telephone number at which she could reach him to arrange to retrieve her bag if it passed the sniff test.

Still holding the bag, however, Ms. Nurse started to enter a taxicab, and, in Sgt. Brennan's hearing, told the driver she would give him a destination once she was inside the cab. Sgt. Brennan then instructed her to get out of the cab; she and her bag were both being detained. Other members of the Unit had in the meantime arrived, and the officers escorted Ms. Nurse a short distance back into the station concourse. The bag was placed on the floor, and the officers called over a canine team. The first dog summoned "showed interest" in the bag, but the handler remarked that the dog was not "working properly,"[3] and a second canine team was sent for, arriving in a "couple of minutes." The second dog clearly "alerted" on the bag, and Ms. Nurse was placed under arrest. The entire encounter took place over a 20–30 minute period.

After her arrest Ms. Nurse was taken to the Amtrak Police Office in the station and advised orally of her rights by Det. Edward Curley. She was also told that the police now believed they had probable cause to search her bag. Given the late hour, it would likely be several more hours before a search warrant could be procured, but one would be applied for if she continued to refuse consent to search her bag. If, on the other hand, she were to consent to a search, Det. Curley said, and no drugs were found, she could leave with her bag. If drugs were found, her case could then be "processed immediately." Ms. Nurse relented and agreed to the search, which revealed four kilo-sized bricks of cocaine, to each of which was attached a bag of crack. When asked if there was marijuana in the bag, Ms. Nurse responded, "No; it's coke."

Later, at the station house, Ms. Nurse was again advised of her rights, and she signed a card waiving her right to an attorney before responding to questions. She made at least one incriminating statement to a police interrogator, and was overheard making several others in the course of a telephone conversation with her mother in New York.

## II.

The Court concludes that Sgt. Brennan's graduated responses to his growing suspicion of defendant as a narcotics courier were fully compatible with the teaching of such cases as *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) and *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). Although Sgt. Brennan had no more than a hunch, born of his experience, when he first observed her, defendant's successive reactions to his inquiries caused it to ripen into the reasonable, articulable suspicion necessary to the minimally intrusive seizures of her person and property he ultimately effected before arresting her.

■■■ Defendant was visibly nervous as she was being questioned. Her explanation for her trip from New York to Washington was that she was planning a post-midnight visit to an acquaintance of unknown duration, whom she identified only by a first name. Asked for her own identification, defendant produced a document, dated only days earlier, of a type commercially marketed for the purpose of identification alone, without any verification of the identifying data, and known to Sgt. Brennan to be frequently used for purposes of deception. Defendant denied carrying drugs, but declined to allow the contents of her bag to be inspected, and then also declined the suggestion that she voluntarily permit it to be exposed to a canine sniff as an alternative. Sgt. Brennan then had grounds to detain the bag briefly for that purpose even against her wishes, and told her so, adding that she was free to stay or go as she pleased. He informed her of the means of retrieving the bag if she left.

3. The dog was later discovered to have been ill.

■ Defendant chose to leave, but attempted to take the bag with her. She also sought to avoid disclosing her destination within the officer's hearing. Sgt. Brennan thus acquired the reasonable suspicion necessary to justify the ensuing investigatory detention of her person as well as her property. Finally, the positive "alert" on the bag by the narcotics detection dog moments later supplied the probable cause for defendant's arrest.

■ Defendant's eventual consent to the search of the bag, and the incriminating statements she made while in custody followed, by her own admission, the advice as to her rights given her by Det. Curley. There was no coercion employed, other than that resulting from her predicament itself. The cocaine and cocaine base, and defendant's statements, were lawfully acquired by the police, and will be admissible at her trial.