**UNITED STATES of America**

**v.**

**Robin NURSE, Appellant.**

**No. 89-3190.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 10, 1990.

Decided Oct. 19, 1990.

R. Kenneth Mundy, Washington, D.C., for appellant.

Gilberto de Jesus, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before MIKVA, SILBERMAN and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

This appeal concerns the propriety of the Metropolitan Police Department's detention of the appellant and her luggage at Union Station, which ultimately led to the discovery of several kilos of cocaine and her indictment on charges of narcotics possession with intent to distribute. Appellant challenges the district court's denial of her motion to suppress the physical evidence, alleging Fourth Amendment violations. We conclude that the detentions were justified by reasonable suspicion; accordingly, we affirm the district court's decision, *United States v. Nurse,* 723 F.Supp. 830 (D.D.C.1989).

I.

Robin Nurse arrived by train from New York City into Union Station at approximately 12:30 a.m. on April 14, 1989. Sgt. John Brennan, a veteran Metropolitan Police Department narcotics officer, noticed Nurse's very slow pace and various other mannerisms. He followed her outside the station to a taxi stand, where she asked the dispatcher for a cab to "First Street, N.W."

Sgt. Brennan, wearing plain clothes and a concealed weapon, approached Nurse and identified himself as a police officer. He asked her where she was traveling from and where she lived; she responded "New York." Despite some initial fumbling, Nurse was eventually able to produce her train ticket, which indicated that she had paid cash for it. Sgt. Brennan asked her for identification, and she handed him a commercially available card in the name of "Shawna Green." Although he did not know at that time that the information on the card was false, he testified at the preliminary hearing that he had "never seen one [of those cards] that was legal," and that they could be "bought at any street corner i.d. shop in New York City." In response to various other questions, Nurse explained that she was visiting a friend named "Sheree," that she didn't know how long she had known her, and that she never had visited her before.

Based on these responses, the identification card, and Nurse's very nervous behavior, Sgt. Brennan requested permission to search her totebag. She refused. Sgt.

Brennan requested permission for a narcotics dog to sniff the bag. That, too, she refused. Sgt. Brennan then informed Nurse that he was detaining her bag for a canine sniff, but that she was free to leave. He gave her his name and a number where she could later reach him to retrieve the bag.

Still holding her bag, however, Nurse started to get in a taxi. She told the driver, within Sgt. Brennan's earshot, that she would give him a destination when she got in the cab. At that point, Sgt. Brennan informed Nurse that he was detaining her as well as the bag, and instructed her to get out of the taxi. Several other narcotics officers arrived, and they escorted her back into the station.

A twenty or thirty minute canine sniff then ensued. The first dog's handler reported that the dog "show[ed] some interest in the bag," but the handler did not want to call an alert because he felt the dog was not "working properly." Within a few minutes, another detective brought over a second dog, which in fact alerted on the bag. Nurse was then placed under arrest, taken to the Amtrak Police Office at Union Station, and advised of her rights. An officer told Nurse that the police believed they had probable cause to search her bag, and that, given the late hour, she had two options: she could wait several hours for a search warrant to be obtained, or she could consent to the search and be released if no evidence turned up (or immediately processed if any did). Nurse consented to the search, which revealed four kilo-sized bricks of cocaine and several bags of crack.

## II.

As a preliminary matter, it may be helpful to characterize the events at issue here within the specialized analytical framework of the Fourth Amendment. In examining Sgt. Brennan's actions, the first issue is whether his initial questioning of Nurse or his subsequent conduct towards her and her bag amounts to a "seizure" or "detention" implicating the Fourth Amendment. *See, e.g., Florida v. Royer,* 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) ("If there is no detention—no seizure within the meaning of the Fourth Amendment—then no constitutional rights have been infringed."). If we determine that there has been a detention or seizure, the next question is whether the action was supported by a constitutionally appropriate quantum of evidence. Three important Supreme Court decisions serve as the backdrop for these inquiries.

In *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968), the Court held that all "seizures" are not equal: specifically, full-fledged arrests, requiring probable cause, can be distinguished from "stops" of suspects necessary to uncover weapons, justifiable on reasonable suspicion that the suspect is armed and dangerous. (These two categories are often referred to broadly as "seizures" or "detentions," despite their conceptual differences.) In a footnote, the Court identified a third category of "personal intercourse between policemen and citizens," which it suggested would not even implicate constitutional rights. *Id.* at 19 n. 16, 88 S.Ct. at 1879 n. 16. Later cases extended the weapons rationale of the Terry stop to detentions grounded on reasonable suspicion of other criminal activity, *see, e.g., United States v. Brignoni-Ponce,* 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975) (border patrol may detain automobiles briefly for questioning upon reasonable suspicion that passengers are illegal aliens), and provided an objective test for determining when a "seizure" has actually occurred. *See United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.) ("a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave"); *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (explicitly adopting *Mendenhall* test).

In *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), a plurali-

ty of the Supreme Court sought to clarify the distinctions among the categories identified in *Terry.* With respect to the difference between an arrest and a *Terry* stop, the Court described *Terry* and its progeny as limited exceptions to the general rule requiring probable cause for seizures, and extended this reasonable suspicion exception to temporary detentions for questioning a suspect about illegal drug transactions. *See* 460 U.S. at 498–99, 103 S.Ct. at 1324–25. While the *Royer* plurality did not dispute the existence of reasonable suspicion on the facts of that case (where the suspect had purchased a one-way ticket from Miami to New York in cash under an assumed name), it concluded that the detention had escalated into a more serious seizure, requiring probable cause, when the police held onto the suspect's ticket and identification and took him into a small room for questioning. *See id.* at 502–03, 103 S.Ct. at 1326–27. As to the propriety of police encounters with suspects absent reasonable suspicion ("non-seizures"), the plurality noted that "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen...." *Id.* at 497, 103 S.Ct. at 1324.

*United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), provides the final piece of the seizure puzzle relevant to this case. In *Place,* the Court extended the *Terry–Royer* reasonable suspicion exception to temporary detentions of personal effects for the purpose of conducting limited investigations, including sniffs by narcotics detection dogs. *See id.* 462 U.S. at 702, 103 S.Ct. at 2641. The Court emphasized the analytical similarities between investigative seizures of suspects and personal property, and found that the ninety minute detention of Place's luggage exceeded the bounds of a reasonable suspicion detention, especially where the officers failed to inform him of the luggage's destination, the expected length of its detention, and arrangements for retrieving it. *See id.* at 709–10, 103 S.Ct. at 2645–46.

Using these cases as a framework, we turn to the specific actions at issue in this case.

A. *The Initial Encounter*

A substantial body of case law from this Circuit, grounded in the Supreme Court precedent discussed above, indicates that Sgt. Brennan's initial encounter with Nurse, in which he approached her, identified himself as a police officer, and questioned her, does not amount to a "seizure," "detention," or "stop" under the Fourth Amendment. In *United States v. Winston,* 892 F.2d 112, 115 (D.C.Cir.1989), this court examined precisely the type of drug interdiction interview engaged in by Sgt. Brennan here, and concluded, citing *Terry* and *Mendenhall,* that no seizure had occurred where an officer, lacking articulable suspicion, approached an individual, identified himself, and asked a series of questions, culminating in a request to search the suspect's bags. Because no seizure had occurred for purposes of the Fourth Amendment, the court found the officer's lack of articulable suspicion prior to the approach and questioning unobjectionable. *Id.* at 117. *See also United States v. Smith,* 901 F.2d 1116, 1118 (D.C.Cir.1990) ("an encounter between a police officer and a citizen, involving no more than approach, questioning, and official identification, does not constitute a seizure and does not require probable cause, articulable suspicion, or any other 'kind of objective justification,' " (citation omitted)); *United States v. Baskin,* 886 F.2d 383, 386–87 (D.C.Cir. 1989), *cert. denied,* — U.S. —, 110 S.Ct. 1831, 108 L.Ed.2d 960 (1990). The foregoing decisions clearly demonstrate, then, that Sgt. Brennan's initial encounter with Nurse does not raise constitutional concerns, and Nurse herself effectively concedes as much.

B. *Detention of Nurse and the Bag*

In the course of their conversation, Sgt. Brennan decided to detain Nurse's bag for a canine sniff. He told Nurse that she could leave, and gave her a phone number where she could call him to retrieve the

bag. Instead of complying, however, Nurse started to get into a cab with the bag, at which point (and after she attempted to conceal her destination from him) Sgt. Brennan announced that he was detaining Nurse as well, and instructed her to get out of the cab. The government does not dispute that Nurse and her bag were seized for purposes of the Fourth Amendment. Thus, the relevant question is whether Sgt. Brennan possessed reasonable suspicion at the time of the detentions. Although the detentions of Nurse and the bag are temporally separate events, the same quantum of suspicion is constitutionally required. Therefore, the underlying justifications for the seizures merit common discussion.

An experienced narcotics officer, Sgt. Brennan decided to detain the bag and Nurse based on the following facts: (1) Nurse's arrival late at night on a train from a "source" city with a ticket she had paid for in cash; (2) her production of a dubious means of identification; (3) her inappropriately vague answers to questions about her destination and host; and (4) and her extremely nervous behavior. Sgt. Brennan's decision to detain Nurse was also predicated on: (5) her attempt to leave after he had told her he was detaining the bag, and her efforts to conceal her destination from him.

Ample precedent supports a finding of reasonable suspicion under these facts. *See, e.g., United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 1583, 1586, 104 L.Ed.2d 1 (1989) (reasonable suspicion existed to detain suspect where officers knew that, *inter alia,* he had purchased round trip plane tickets from Honolulu to Miami in cash, he traveled under a name that did not match that under which his telephone number was listed, he appeared nervous during his trip, and he checked none of his luggage); *Royer,* 460 U.S. at 502, 103 S.Ct. at 1326 (reasonable suspicion existed to detain suspect and his luggage, where officers knew that he had purchased a one-way plane ticket from Miami to New York in cash under an assumed name); *United States v. Tavolacci,* 895 F.2d 1423, 1426–27 (D.C.Cir.1990) (reasonable suspicion existed to detain suspect where the officers knew that he had paid cash for his train ticket, that he was traveling from a source city, that he had a "look of shock" on his face, and that his ticket and identification were in different names). Viewing the totality of the circumstances, as the Supreme Court has instructed us to do, *see Sokolow,* 109 S.Ct. at 1585, we believe that Sgt. Brennan developed reasonable suspicion of Nurse's illicit drug activity to justify his detention of the bag for a canine sniff and his subsequent detention of Nurse herself.

Finally, we note that the seizures here were minimally intrusive, a factor the Supreme Court has previously considered relevant. *See Place,* 462 U.S. at 709, 103 S.Ct. at 2645 (discussing "whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion"); *Royer,* 460 U.S. at 500, 103 S.Ct. at 1325 (noting that "[t]he scope of the detention must be carefully tailored to its underlying justification"). Several police officers escorted Nurse—without any physical contact or show of weapons—a short distance back into the main concourse from the taxi stand. During the detention, she remained in the open area of the train station, unlike the suspect in *Royer,* who was taken to a "police interrogation room" within the airport. 460 U.S. at 503, 103 S.Ct. at 1327. The detention lasted only twenty to thirty minutes, the amount of time necessary to conduct the canine sniff, and the sniff itself appears to have been conducted diligently, notwithstanding the first dog's failure to perform properly. *Compare United States v. Sharpe,* 470 U.S. 675, 683, 105 S.Ct. 1568, 1577, 84 L.Ed.2d 605 (1985) (approving twenty minute detention) *with Place,* 462 U.S. at 709–10, 103 S.Ct. at 2645–46 (finding ninety minute detention of person or luggage unreasonable); *see also Tavolacci,* 895 F.2d at 1427 (finding that police acted diligently in conducting a canine sniff, where approximately fifteen minutes elapsed before dog was procured,

even though officers had advance notice of suspect's arrival). On these facts, we cannot say that the officers' conduct exceeded the established bounds for reasonable suspicion detentions of persons and property.

III.

For the foregoing reasons, the district court's denial of appellant's motion to suppress is

*Affirmed.*