THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JOHN STATHAM, Defendant-Appellant.

First District (3rd Division)   No. 1—89—2133

Opinion filed January 23, 1991.

Walsh & Neville, Ltd., of Chicago (Ronald F. Neville and Anne B. Kokoris, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Jean T. McGuire, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE CERDA delivered the opinion of the court:

Defendant, John Statham, was found guilty after a bench trial of possession of a controlled substance with intent to deliver. (Ill. Rev. Stat. 1985, ch. 56½, par. 1401(a)(2).) Defendant was sentenced to six years and six months' imprisonment and was fined $1,000. Defendant argues on appeal that: (1) the trial court erred in denying his motion to quash the arrest and to suppress the evidence because the trial court erroneously ruled that defendant had the burden to prove coercion and also ruled that the initial stop and the detention of defendant's suitcase were not seizures; and (2) the trial court erred in finding that the State proved defendant's knowing possession of a controlled substance beyond a reasonable doubt.

Defendant moved to quash his arrest and the search warrant and to suppress the evidence obtained as a result of the search of his suitcase.

Drug Enforcement Agency (DEA) Special Agent Larry Johnson testified at the hearing on the motion to suppress that on September 18, 1985, he and DEA Agent Bob Fulkerson were assigned to O'Hare airport to watch arriving passengers for the purpose of narcotics interdiction. He did not receive any specific information prior to monitoring defendant's arriving flight from Denver. Denver was a "transshipment city," which he defined as a large city through which a large quantity of narcotics is moved to smaller areas. He first observed defendant probably three or four minutes after defendant left the plane and approximately one-half hour before he approached defendant in the baggage claim area. His attention was first attracted to defendant as he walked by because of the manner in which he looked for one or two seconds at Johnson and Fulkerson, who were sitting in the concourse.

Johnson and Fulkerson followed defendant to the baggage claim area, and defendant twice turned around and looked in their direction. Defendant met a man at the end of the concourse, shook his hands, and conversed with him for 5 or 10 seconds. Both men rode the escalator down, and as they stepped off the escalator, the other man motioned towards the baggage claim area. He left, and defendant walked to the baggage claim area, where he picked up a maroon Samsonite brand suitcase.

At approximately 1 p.m., Johnson and Fulkerson walked along with defendant as he walked out of the baggage claim area, and when they reached the vestibule area, they identified themselves as Federal officers. They were dressed casually, and they did not display weapons. They showed defendant their credentials and asked if they could speak with him. They stood in a vestibule area about 12 by 12 feet between a double set of automatic doors that opened when one stepped on the mats. They did not stand between defendant and the exit doors, and defendant stood eight feet from the exit door.

Defendant stopped walking through the exit doors after the officers approached him. The officers' voices were not raised above conversational tones. Fulkerson asked defendant if he had identification, and defendant produced a plastic card in the name of John C. Statham. Fulkerson asked defendant if he had a driver's license, and defendant said he left it at home. Fulkerson asked him if he had an airline ticket, and defendant said that he had left it on the "airport."

Fulkerson asked defendant what he was doing at the airport, and defendant said he had flown in from Phoenix, Arizona.

Fulkerson looked at the identification sticker on defendant's suitcase and noticed that it stated Jeff Driscol and that it had an address in Phoenix. Fulkerson asked defendant why the name on the sticker was different, and after a moment of hesitation, defendant said he had the wrong suitcase. Fulkerson then suggested that they go back to the baggage area and try to find defendant's baggage.

As defendant was picking up the suitcase to return to the baggage claim area, Fulkerson observed an airline ticket in the outside pocket of defendant's carry-on bag. Fulkerson asked defendant if he could see the ticket, and defendant handed the ticket to him. The name on the ticket was Jesse Drisco. Johnson observed that the ticket was for one-way travel from Phoenix to Denver to Chicago and was purchased with $155 cash on the same day of travel. The ticket was returned to defendant, and defendant was told he was free to leave at that point. Fulkerson would not have followed defendant. Defendant was told on two different occasions that he was free to leave, but if defendant had wanted to leave, the officers would have had to decide whether to detain the suitcase.

Fulkerson left the vestibule to see if he could speak with the man who had met with defendant. He had a suspicion that the bag contained illegal narcotics because of the untruthfulness of defendant's answers and because defendant had arrived from the southwest.

Johnson testified that he remained with defendant when Fulkerson left. Defendant was still free to leave but he did not ask to leave. Johnson asked defendant if he had some additional identification, and defendant removed from his wallet an Illinois driver's license with an Illinois address, a social security card, and a western telephone company credit card. Defendant now stated that someone in Phoenix had given him the suitcase to bring to Chicago. Johnson asked defendant about the bulge in his pants pocket, and defendant said it was his keys. Upon his request, defendant showed him the keys and later removed a Samsonite suitcase key. The key and the suitcase appeared new, and Johnson believed that the key might belong to the suitcase.

Fulkerson explained to defendant that he did not have to allow them to search his luggage. Defendant allowed them to search his shoulder bag, but he did not let them search his suitcase. Fulkerson searched the shoulder bag but did not find any contraband. Fulkerson told defendant that they had reason to believe that there were narcotics in the suitcase and that it was being detained until a drug-detecting dog could sniff it. Ten minutes elapsed from the time they first

spoke to defendant and until the time they detained the suitcase. Defendant then left the airport.

A narcotics dog sniffed suitcases in a lineup and barked at defendant's suitcase. Johnson obtained a warrant for the search of the suitcase, which was opened with defendant's key. Inside the suitcase was a box which contained a plastic bag of cocaine that had been placed inside other plastic bags along with coffee grounds. The suitcase contained no clothing.

Fulkerson's testimony was similar to Johnson's testimony. In addition, he testified to the following. Fulkerson's curiosity was aroused by the suitcase, by defendant's glance over his shoulder, and by defendant's arrival from Denver, a transshipment point. He had arrested numerous people who carried new medium hard shell Samsonite suitcases that contained drugs. Defendant was told that the officers were conducting a drug investigation but that he was not under arrest. Defendant did not appear nervous and did not express a desire to stop the conversation and leave. The vestibule area where they stopped contained an elevator to the upper level and an automatic door that led into the terminal. Fulkerson stood 2½ feet to 4 feet away from defendant. Defendant's movement was not blocked.

Fulkerson observed a sticker on the suitcase that had the name Jeff Driscol and a Phoenix address. He asked defendant if he was traveling under his name, and defendant stated that he often used other names when traveling. He asked defendant from where he was traveling, and defendant stated Phoenix. Defendant denied talking to someone on the escalator. The suitcase was detained because of the previously mentioned factors and because defendant had lied.

Defendant testified that when he arrived on September 19, 1985, he did not meet anyone at the airport except Fulkerson and Johnson, who stopped him and said they would like to ask him a couple of questions. Fulkerson stood between defendant and the exit door that was in front of defendant. Johnson stood to defendant's left and faced defendant. The doors on the second mat were wide open. Fulkerson and Johnson were taller and larger than defendant, and one of them had handcuffs on his belt. Neither one of the officers touched defendant. Six or seven people walked past defendant during his conversation with Fulkerson. Defendant asked Fulkerson what he wanted to know and why was he being stopped. Fulkerson replied that they were doing a Federal drug investigation and that he would like to ask defendant a few questions. He pointed down to his belt, which had a United States stamp on it, and defendant believed that Fulkerson was a law enforcement officer.

Fulkerson asked defendant what he was doing in Chicago, and defendant said that he was going to visit his son. Fulkerson asked defendant if he had a driver's license, and defendant said no. Defendant pulled out his wallet and found an Illinois State identification card which he handed over to Fulkerson. He also had a social security card and a Mountain Bell telephone card in his wallet, but he did not produce a driver's license. Fulkerson asked defendant if he had an airline ticket, and defendant said that he thought he had left it on the airplane. Fulkerson asked defendant why the name on the suitcase did not match the name on the identification card, and defendant said that he took the suitcase to Chicago for a friend. He did not recall Fulkerson asking him to go back to the baggage claim area to get the right bag.

Defendant testified that Fulkerson again asked defendant to look for his airline ticket, and defendant again stated that he did not have it and that he thought he had left it on the airplane. Johnson reached into the pouch of defendant's shoulder bag without permission and found the ticket, which could not be seen from outside the pouch. He asked defendant why the ticket had a different name on it, and defendant said that someone had given it to him. The suitcase sticker had the name of Jeff Driscoll, and the airline ticket was under the name of Jesse Driscoll. Defendant did not purchase the ticket, but it was given to him by the friend who asked him to take the suitcase.

Fulkerson tried to open the suitcase and asked defendant to pull the car keys out of his pocket. After defendant did so, Fulkerson took a luggage key that opened defendant's own Samsonite luggage. At one point Fulkerson left, and defendant then asked Johnson if he was free to leave. Johnson said that he had to wait until the other agent returned, which was about three to four minutes later. When Fulkerson returned, defendant was informed that they were taking the suitcase and that if any narcotics were found, "he" was "coming after" defendant. Defendant did not feel that he was free to leave while talking with the two men. Defendant had been stopped for between 20 to 30 minutes.

The trial court denied the motion to suppress. The trial court ruled that: (1) whether or not the agents blocked the path or stopped defendant from leaving, the court took the officers' testimony "above" defendant's testimony; (2) defendant had "the burden of proof in this case;" (3) the officers' testimony was at least as credible as defendant's testimony; (4) the officers did not block his path; (5) the encounter was not a seizure; (6) there were reasonable and articulable facts allowing the officers to take and detain the suitcase; and

(7) the initial encounter was consensual although it was not based on a reasonable suspicion.

It was stipulated to that: (1) the chain of custody of the clear plastic bag containing white powder found in defendant's suitcase was proper; (2) if called, Gerald Skowronski would testify that he was a DEA chemist who analyzed the white powder and he was qualified to give an expert opinion that the powder was 476.43 grams of cocaine; (3) defendant's fingerprints were not on the bags of cocaine; (4) defendant gave Johnson a key that was used to open the suitcase; and (5) if the Secretary of State of Illinois were called, he would testify that an Illinois driver's license number existed for defendant with the number S33546361026.

Johnson testified at trial to substantially the same facts he testified to at the hearing on the motion to suppress. In addition, Johnson testified that defendant did not state the friend's name who had given him the suitcase or where he was going to take the suitcase, and the number of defendant's Illinois driver's license he recorded was S33546361026.

Defendant testified on his own behalf at the trial that in September 1985 he came from Arizona, where he worked, to Chicago to attend the wedding of Brad Ghezzi in South Holland, Illinois. He stayed with his brother, who asked him if he could stay for the anniversary party, but defendant said he could not take that much time off from work. His brother also asked if defendant could come back, but defendant said he doubted if he could afford to come back.

Ghezzi, who was also from Arizona, called defendant on September 18 and asked defendant if he was still interested in going back to Chicago for the anniversary. He told defendant that his friend was planning to take a suitcase back to his brother in Chicago but could not make it and that defendant could use the ticket which had been purchased in the name of Jeff Drisko. Defendant accepted the offer. The suitcase could not be checked at the airport without an address identification. Defendant wrote Jeff Drisko's name on the suitcase identification sticker because that was the name on the ticket. He did not look at the ticket and did not know that the name on the ticket was "Jess [sic] Drisko." He did not know Jeff Drisko.

Defendant testified that Ghezzi had told defendant to look out for either his brother or for a Rolls Royce which would be parked at the airport to pick him up. When he got to the baggage claim area, he saw Ghezzi's brother whom he had met at the wedding. He motioned to defendant that he was going to get the automobile. When the two officers approached defendant, Ghezzi's brother drove the automobile

away. He did not recall if he told the officers that he was traveling under his right name, but he did tell them that he was bringing the suitcase to Chicago for a friend. He did not tell the officers that he had just seen the person to whom he was to give the suitcase. The Illinois identification card that he showed the officers contained his driver's license and social security numbers. He did not have an Illinois driver's license on September 14, 1985. He had owned Samsonite luggage for three or four years, and his Samsonite key did not fit the suitcase he carried. The officers offered him a receipt for the suitcase but he did not take it because the suitcase was not his.

Defendant left Chicago the next day because he was angry and wanted to contact Ghezzi to find out why he had been stopped. Defendant had tried to telephone him but could not reach him. Ghezzi told him not to worry. He did not know that Ghezzi was involved in narcotics trafficking. He found out later that the Ghezzi brothers were convicted of narcotics offenses and were in the penitentiary.

It was stipulated to that if Brad Cohen were called, he would testify that he was a technician who serviced Samsonite luggage and that one key would open 98% of Samsonite luggage except extremely old or brand new models.

The trial court found that the evidence of defendant's guilt was overwhelming. Defendant filed a motion for new trial in which he argued, *inter alia*, that the State did not prove him guilty beyond a reasonable doubt and the trial court erred in denying his motion to quash the arrest and to suppress the evidence. The motion for new trial was denied.

Defendant first argues that the trial court erred in denying the motion to suppress because the trial court allegedly indicated in its oral ruling that it placed the burden on defendant to prove the existence of coercion and because the State did not meet its burden of proof that he voluntarily stopped to speak with the officers.

■■■ An unlawful seizure under the fourth amendment occurs only when an officer restrains one's liberty by physical force or by show of authority. (*People v. Jones* (1989), 190 Ill. App. 3d 416, 421, 545 N.E.2d 1332.) An officer can approach a person who has deboarded an airplane and ask him questions if that person's freedom is not restrained. (*People v. Brett* (1984), 122 Ill. App. 3d 191, 195, 460 N.E.2d 876.) The test for determining whether a person was seized is whether a reasonable person would have believed that he was free to leave. (*Jones*, 190 Ill. App. 3d at 421.) If the stop was not consensual because there was either force or threatened force (*People v. Jordan* (1976), 43 Ill. App. 3d 660, 662, 357 N.E.2d 159), then the stop must

have been warranted by specific and articulable facts (*Terry v. Ohio* (1968), 392 U.S. 1, 21, 20 L. Ed. 2d 889, 906, 88 S. Ct. 1868, 1880). At a suppression hearing, the burden to prove that the seizure was unlawful is placed on defendant by statute:

"The motion shall be in writing and state facts showing wherein the search and seizure were unlawful. The judge shall receive evidence on any issue of fact necessary to determine the motion and the burden of proving that the search and seizure were unlawful shall be on the defendant." (Ill. Rev. Stat. 1989, ch. 38, par. 114—12(b).)

The trial court's finding on a motion to suppress evidence will not be disturbed unless it was manifestly erroneous. *People v. Long* (1983), 99 Ill. 2d 219, 231, 457 N.E.2d 1252.

Defendant argues that the State had the burden of proving that he voluntarily stopped to speak with the officers.

In *United States v. Mendenhall* (1980), 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870, defendant arrived at Detroit airport on a flight from Los Angeles, and two DEA agents approached defendant as she was walking through the concourse, identified themselves as Federal agents, and asked to see her identification and airline ticket. After defendant produced her driver's license, which was in her name, and her ticket, which was issued in another name, the agents questioned her briefly. After returning the ticket and driver's license to her, one of the agents asked defendant if she would accompany them to the DEA airport office for further questions and defendant did so. In the office defendant consented to a search of her person and property. Heroin was seized during the search. The decision in the case was that the evidence was sufficient to support findings that defendant was not seized, that she voluntarily accompanied agents from the concourse to the DEA office, and that defendant voluntarily consented to a search of her person. (*Mendenhall*, 446 U.S. at 555, 558-60, 64 L. Ed. 2d at 510, 512-13, 100 S. Ct. at 1877, 1879-80.) The court stated:

"We adhere to the view that a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards. The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.'" *United States v. Mendenhall*, 446 U.S. at 553-54, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877.

Defendant relies upon the statement in *Mendenhall* (446 U.S. at 557, 64 L. Ed. 2d at 511, 100 S. Ct. at 1879), that the State had the burden of proving the voluntariness of defendant's consent to accompany agents to their office for further questioning (after an initial encounter which did not constitute a seizure). But *Mendenhall* did not decide the issue whether the State had the burden of proving that defendant voluntarily stopped when he was approached by the agents at the airport. *People v. Jones* (1989), 190 Ill. App. 3d 416, 422, 545 N.E.2d 1332, which was also relied upon by defendant, nevertheless cited *Mendenhall* as authority for the statement that the State has the burden of proving whether an encounter was consensual. Two of the other cases cited by defendant are distinguishable because they held only that the State has the burden of proving that *statements* were made voluntarily. *People v. Sickley* (1983), 114 Ill. App. 3d 167, 172, 448 N.E.2d 612 (the State has the burden of showing that a statement was made without compulsion); *People v. Genus* (1979), 74 Ill. App. 3d 1002, 1007, 393 N.E.2d 1162 (defendant has the burden of proving that a statement was not given incident to a lawful arrest while the State has the burden of proving the statement's voluntariness if defendant seeks to suppress it as involuntarily given).

■ In contrast to *Jones*, at least one authority has stated that the United States Supreme Court has not determined who has the burden of proof in motions to suppress in situations other than consent to *searches*. (4 W. La Fave, Search & Seizure, §11.2(b), at 232 (2d ed. 1987) ("the Supreme Court has held, albeit without any extended discussion of the issue, that the burden of proof *must* be on the prosecution when it is claimed that the evidence was obtained in a search by consent \*\*\*. However, the Court has not spoken in such direct terms about allocation of the burden in other situations).") (Emphasis in original.) In Illinois, by statute the burden is placed on defendant to prove that the seizure was unlawful (Ill. Rev. Stat. 1987, ch. 38, par. 114—12(b)), but the burden of going forward with evidence of legality is on the State after defendant proves that a search was warrantless (see, *e.g., People v. Burton* (1985), 131 Ill. App. 3d 153, 156, 475 N.E.2d 583 (the burden of going forward with evidence to demonstrate legal justification shifts to the State once defendant proves that a warrantless search has occurred and that defendant was doing nothing unusual at the time of the search)).

■ It is unclear whether the trial court was referring in its oral ruling to the burden of proving that an initial encounter was consensual or to the ultimate burden to prove that a seizure was unlawful. But even if the State did have the former burden and the trial court

erroneously imposed that burden on defendant, the State met its burden. The officers testified that they asked whether they could speak with defendant and that defendant did not show a desire to stop the conversation and to leave. The trial court specifically found the officers' testimony to be more credible than defendant's testimony.

Defendant next argues that his was the only credible account of his initial encounter with the officers. Defendant argues that: (1) the officers' versions were "patently coordinated and developed to comport with their understanding" of the law; (2) the officers' testimony that defendant was not nervous in their presence was necessary to show that defendant was not coerced; (3) the testimony that implied that he was nervous as he walked in the concourse was designed to depict him as someone who knew he was committing a crime; (4) it contradicts human experience that a nervous individual would appear calm when confronted by police; and (5) incredible was the officers' testimony that: (a) the airline ticket was sticking out of the bag when defendant said he left it on the airplane; (b) the officers repeatedly told defendant that he was not under arrest and was free to go; and (c) only 10 minutes elapsed between the initial encounter and the last conversation.

■■ There is no indication that the officers invented testimony in order to defeat defendant's motion to suppress. It is not inherently incredible that a person whose checked baggage contained illegal drugs could appear calm when confronted by officers or that an airline ticket sticking out of a carry-on bag could be detected by a Federal narcotics officer. It is also not incredible that Federal narcotics officers should tell a person being questioned that he was not under arrest and could leave because such a statement would be evidence that defendant was not seized. It is not incredible that the events could have occurred within 10 minutes, and furthermore, an error in calculating the elapsed time would not necessarily make questionable the other testimony of the officers concerning the consensuality of the encounter with defendant.

Defendant also argues that his testimony established that he had been seized because: (1) he was physically restrained and confined in a small area; (2) he was intimidated by Fulkerson's voice of authority; (3) he was not advised that he was free to leave; (4) he felt compelled to remain; and (5) he was stopped for 20 to 30 minutes.

The trial court could properly have found the officers' testimony more credible: (1) they told defendant that he was not under arrest and that he could leave; (2) weapons were not displayed; (3) they asked his consent to speak with him; (4) they did not stand between

defendant and the exit doors; and (5) defendant's movement was not blocked. Defendant cites *People v. Kiser* (1983), 113 Ill. App. 3d 501, 447 N.E.2d 858, in which an investigatory stop was held to be a seizure. But it is distinguishable because defendant was physically grabbed prior to being asked to speak to a Federal agent and because the exit doors were blocked by two officers.

The trial court did not err in relying on the following cases in determining that the encounter was consensual. In *United States v. Notorianni* (7th Cir. 1984), 729 F.2d 520, defendant was not seized where a DEA officer obtained defendant's consent to ask him some questions without touching defendant or displaying his weapon. In *United States v. Espinosa-Alvarez* (7th Cir. 1988), 839 F.2d 1201, it was held that there was no seizure of a defendant who was approached by two detectives who identified themselves, where defendant was willing to speak with them, and where the detectives did not display weapons, raise their voices, threaten defendant, or interfere with defendant's freedom to leave. In *People v. Forrest* (1988), 172 Ill. App. 3d 385, 526 N.E.2d 616, no seizure was found of a defendant who consented to speak with a police officer after leaving the airport terminal and who was told that he was free to leave.

■ The trial court could properly have found credible the officers' testimony that defendant consented to speak with them and that defendant was free to leave. The trial court therefore did not err in relying on the above cases and in finding that the initial encounter was not a seizure. See *People v. Menendez* (1990), 199 Ill. App. 3d 612, 618-19, 557 N.E.2d 462 (defendant agreed to answer questions, defendant's movement was not restricted through physical contact or by words, defendant was not threatened, officers did not display weapons, defendant was informed that he was free to leave, and defendant agreed to cooperate); *People v. Price* (1990), 195 Ill. App. 3d 701, 707, 552 N.E.2d 200 (defendant agreed to speak to officers who did not block his movement and who asked if they could speak with defendant).

Defendant next argues that the information learned by the officers did not provide them with a reasonable and articulable suspicion that his suitcase contained narcotics so that its detention was unlawful.

■ Luggage may be briefly detained to conduct a canine sniffing test if the officer's observations led him reasonably to believe that the luggage contained narcotics. (*United States v. Place* (1983), 462 U.S. 696, 706, 77 L. Ed. 2d 110, 120, 103 S. Ct. 2637, 2644.) The exposure of airline passenger luggage to such a canine sniffing test is not a

search within the meaning of the fourth amendment. *Place*, 462 U.S. at 707, 77 L. Ed. 2d at 121, 103 S. Ct. at 2645.

■■ Defendant relies upon *People v. Nelson* (1989), 188 Ill. App. 3d 619, 544 N.E.2d 1111, in which it was held that there was a lack of reasonable and articulable suspicion that defendant's luggage contained narcotics where defendant: (1) purchased a one-way train ticket for Florida in his own name; (2) answered truthfully that he boarded the train in Washington, D.C., where he changed trains; (3) looked around the Chicago station, where he was required to change trains to Portland, Oregon; (4) changed reservations several times and did not leave a call back number; and (5) occupied a sleeping compartment. *Nelson* and the other cases decided after *Place* demonstrate that each factor must be examined in the particular context and that a particular behavior such as looking over one's shoulder upon arrival will not always be indicative of narcotics possession. See *United States v. Edwards* (7th Cir. 1990), 898 F.2d 1273; *United States v. Skidmore* (7th Cir. 1990), 894 F.2d 925; *United States v. White* (8th Cir. 1989), 890 F.2d 1413; *United States v. Nurse* (D.C. 1989), 723 F. Supp. 830; *People v. Menendez* (1990), 199 Ill. App. 3d 612, 557 N.E.2d 462.

Defendant here argues that his glances over his shoulder could have been to search for a person he was to meet. Defendant argues that Fulkerson's claim that he had arrested numerous persons who had similar Samsonite suitcases containing drugs was "irrelevant" on the basis that he did not testify as to how many persons he had arrested for transporting drugs in other types of luggage or as to how many people he would guess that carry Samsonite luggage. Defendant argues that Fulkerson did not successfully explain the significance of defendant's arrival from Denver because a transshipment city was any city with a large airport hub. Defendant argues that anyone could mistakenly believe that his ticket was left on the airplane and that the different versions of the name were attributable to defendant's unfamiliarity with the name.

■■■ ■ Although there could have been innocent reasons for the type of conduct exhibited by defendant, including the possession of a certain type of suitcase, the circumstances as a whole provided the officers with a reasonable suspicion that defendant was transporting contraband so that the detention of the suitcase for a canine sniffing test was justified. Among the factors that were the most significant in providing a reasonable suspicion were defendant's denial that he spoke to another man, defendant's conflicting stories about his ownership of the suitcase, his statement that someone gave him the suitcase

to bring to Chicago, and the initial lie that defendant had picked up the wrong suitcase. The denial of the motion to suppress was proper.

Defendant next argues that his guilt was not proved beyond a reasonable doubt because the State presented no direct evidence that he had knowledge of the presence of the cocaine in the suitcase while he presented evidence that established a reasonable hypothesis of his lack of knowledge.

██ The trial court disbelieved defendant's testimony that he innocently was transporting a suitcase which he did not know contained cocaine. Defendant possessed a new key that fit a new suitcase. Defendant's testimony was inconsistent with the version told to the officers, according to the officers' testimony. Knowledge of the presence of cocaine was inferred from defendant's conflicting versions concerning the ownership of the suitcase, together with all the other circumstances.

The judgment of the trial court is affirmed.

Affirmed.

RIZZI and WHITE, JJ., concur.