THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. GREGORY OHLINGER, Defendant-Appellee.

First District (6th Division)   No. 1—86—0420

Opinion filed June 23, 1989.—Rehearing denied July 21, 1989.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Paula Carstensen, and Douglas Simpson, Assistant State's Attorneys, of counsel), for the People.

Robert A. Fisher, of Chicago, for appellee.

PRESIDING JUSTICE EGAN delivered the opinion of the court:

The State appeals from an order suppressing evidence. At the hearing on the motion to suppress, the defendant, a police officer and a drug enforcement agent testified. Most of the evidence is undisputed.

On March 12, 1985, at approximately 9:25 p.m., the defendant and his wife, Debra, arrived at O'Hare International Airport in Chicago on a flight from Miami, Florida. After they left the plane they walked toward the parking area. He was carrying a brown carry-on bag. They went down an escalator, and at the bottom they were ap-

proached by Officer Kinsella of the Chicago police department and Agents Tucci and Furey of the Drug Enforcement Administration. Kinsella identified himself and told the defendant that he was conducting a narcotics investigation. The defendant agreed to answer some of Kinsella's questions. Kinsella asked the defendant and his wife for identification and their airline tickets; and both gave him their licenses and tickets. Kinsella saw that the name on the defendant's license and airline ticket was the same. The officer asked where they were coming from, and the defendant told him that he came from Miami.

The defendant testified that at that point the officer asked if he could search the defendant's bag. He refused and said he was in a hurry and had a 2½-hour drive home to Freeport, Illinois. The officer said, "This will just take a minute, just come this way." He led the defendant by the arm to a small room that was a short distance away. The defendant testified he went with Kinsella because "[he] had no choice." He was taken into a room, and his wife was right behind him in the room. The defendant asked, "What's this all about?" Kinsella said "This will just take a minute" and opened the defendant's bag. The officer took out a brown paper bag wrapped in tape containing a white powder. After the officer found that paper bag, he searched the defendant and found another brown paper bag inside his boot. That bag also contained a white powder alleged to be cocaine. The officers then took him to another building. He was searched again, and in his pants pocket they found a glass vial, also allegedly containing cocaine. The officer never told him that he was free to go or free not to speak with him. Kinsella never gave him back his license or airplane ticket. On cross-examination he denied that he ever consented to the search of his bag.

Officer Kinsella testified that he and the other officers were monitoring the deplaning passengers from United Airlines Flight 315, a non-stop flight from Miami to Chicago, because Miami is a source city for the importation of cocaine into the United States and the distribution of cocaine throughout the United States. He noticed that the defendant began looking around at other people in the area as he started walking toward the baggage area. He also noticed that the defendant looked back over his shoulder toward Kinsella and the other officers. He was carrying no other luggage than the small brown carry-on bag.

They lost the defendant for a time but saw him again later walking very rapidly and looking around. Kinsella held up his star and identified himself as a police officer and asked if he could speak with

the defendant, who said, "Yes." At the request of the officer, the defendant gave him his Illinois driver's license and a copy of an Eastern Airline ticket in his name indicating a round trip air fare in excess of $500 and a one-day stay in Florida. When the defendant asked what "this was all about," Kinsella told him that they were conducting a narcotics investigation at the airport. As he gave the defendant his driver's license and ticket, he observed that the defendant's hands were shaking and that his stomach was trembling. He asked if the defendant had any other luggage, and the defendant said that the bag was all he had. At that point Kinsella asked if the defendant would consent to a search and advised him "that he had a right not to consent to the search." The defendant told him that they could search the bag but asked if it could be done somewhere else. Kinsella pointed to an area enclosed by elevators on two sides and a wall on the other side and asked if the defendant would like to go there. The defendant said, "Yes."

The defendant picked up the carry-on bag and walked over with Kinsella beside him and Agent Tucci on the other side of or behind him. The defendant's wife and the other officer were several feet away. The defendant put the bag down on the ground, knelt down in front of it and opened it. Kinsella saw the defendant place his left hand on top of a paper bag which was inside the carry-on bag and begin moving clothes around covering up his left hand and the paper bag. The defendant said, "See, I don't have anything in the bag." At that point Kinsella reached in the bag. He had seen the brown paper bag and a portion of a plastic bag with white powder in it. He retrieved that from the bag. He then told the defendant he was under arrest. He conducted a search of the defendant and recovered an additional amount of suspected cocaine from his boot. Later, they recovered a small glass vial containing an additional quantity of narcotics from the defendant's pants pocket.

Agent Tucci's testimony was substantially the same as Kinsella's. Tucci said that when Kinsella asked if he had any other luggage, the defendant was exceptionally nervous and agitated. He was "hyperventilating" and "perspiring." Kinsella asked if the defendant would consent to a search and told him he did not have to consent. There was a pause; and the defendant, who "seemed more relaxed" and "more calm," turned to Kinsella and said, "Yes. You can search, but can we go someplace else to do it?"

After the conclusion of the evidence and arguments, the trial judge made certain remarks before ruling which disclosed an erroneous conception of the applicable law and an erroneous interpretation

of the effect of the contradiction between the testimony of the defendant and the officers. The following are his pertinent remarks:

"I'm asked to determine, first of all, whether there was probable cause in the initial stop of the petitioner herein. At first glance it would appear that there was no probable cause to stop him, and as a matter of fact I hold that there was no probable cause to stop him. Notwithstanding that fact, once he was stopped it appeared that he voluntarily, if you want to concede that fact, engaged in some conversation with the police officers. He handed over his ticket and his driver's license, all of which matched. His name was on them. That, under ordinary circumstances, under the cases, would have been sufficient to cause him to be released. He was not free to go. The police still had authority over him as I alluded to earlier. It then becomes a question of whether he consented to a search or not.

\* \* \*

Under the circumstances here, where the police have stopped him without probable cause but where he felt compelled to submit to their requests for his driver's license and ticket or tickets, where even if I believe that those items were returned to him, in fact, and that is disputed by the petitioner, and whether I believe the testimony of the petitioner or the testimony of the police officers, he was still impelled to accompany them into the vestibule. It appears that if there was a consent it was involuntary, and if there was no consent as the defendant or petitioner testifies, then, in fact it was an illegal intrusion. And so either way under the totality of the circumstances that appear before me this afternoon, I hold that the motion to suppress will be sustained.

\* \* \*

I'm holding that under either viewpoint, if it could be looked upon as a consent, it was a consent arrived at by coercion, and at the same time I'm saying that under the law if—that it also appears that no consent in actuality or refusal of consent was obtained. Here's what I'm confronted with, very honestly. I'm confronted with two reasonable stories. I do not find the defendant petitioner herein unbelievable, and I do find the police officers unbelievable. That's a switch in these kinds of cases. Usually it's very obvious. But I'm saying that under either theory, whether the police officer is testifying truthfully or whether the defendant is testifying truthfully, that under either theory, regarding the totality of the circumstances here, it's an

illegal intrusion. If there was in fact a consent it was involuntarily obtained or it was involuntarily given I should more properly say. If there was no consent then there was an intrusion. There was no basis to hold him. There was no reason to bring him into that vestibule alone and apart.

\* \* \*

You know, the petitioner's testimony in this was very straightforward, very credible. I'm not saying that I disbelieve him and I'm not saying, as I am wont to do from time to time, that I disbelieve the officers. I'm saying that under the circumstances presented here in either case the motion must lie."

We construe the trial judge's remarks to mean that, accepting the testimony of the police officers as true, the initial stop was improper because the police did not have probable cause to make the stop and the defendant may have consented to the search but his consent was not voluntary; or, alternatively, accepting the defendant's version, there never was any consent, voluntary or otherwise.

■■ In our view, the judge misconstrued the law when he held that probable cause was the applicable standard to determine the propriety of the initial stop. The defendant concedes that the correct test is whether the police officers had "reasonable grounds" to stop, not "probable cause." (See *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868.) But, the defendant argues, although the judge may have misspoken, his holding was correct because the evidence establishes that the consensual questioning became an "investigatory stop, a seizure."

■ Since we have determined that this case must be remanded for a new hearing, it is unnecessary to discuss at length the many cases that have been cited. Suffice it to say that a fact finder could conclude that the initial stop and questioning met the standards of *Terry* and *United States v. Mendenhall* (1980), 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870. (See also *United States v. Sokolow* (1989), 490 U.S. ___, 104 L. Ed. 2d 1, 109 S. Ct. 1581; *People v. Hicks* (1989), 183 Ill. App. 3d 636.) If he believed the officers, a fact finder could also conclude that there was no seizure when the defendant went voluntarily with the police officers from the area of the initial stop to the area where the search took place. On the other hand, if he believed the defendant, the fact finder could conclude that a seizure had taken place. It was on this point that the judge erred when he said it made no difference whom he believed.

If the officers' testimony is believed, the facts are similar to those in *People v. Brett* (1984), 122 Ill. App. 3d 191, 460 N.E.2d 876, in

768

which the appellate court reversed an order of suppression based on the trial court's holding that the police exercised control over a defendant after they had returned his identification and airline ticket. In this case the police officers testified that they had returned the driver's license and airline ticket to the defendant; and he testified that they had not. We disagree with the observation of the trial judge that *Brett* is factually inapposite.

In sum, the officers testified that it was the defendant who had asked to have the search conducted elsewhere and that he had consented to the search after he had been told he could withhold consent. The defendant testified that he refused consent, that the officer kept his license and ticket and that he was taken by the arm by Kinsella and escorted by four officers into the area where his bag was searched. We judge that the issues cannot properly be resolved without a determination of the credibility of the witnesses. For that reason we remand this case for a new hearing because left undetermined is the pivotal question whether the defendant did in fact consent to a search.

Judgment reversed and remanded.

McNAMARA and LaPORTA, JJ., concur.