THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. RAFAEL MENENDEZ, Defendant-Appellee.

First District (5th Division)   Nos. 1—88—2573, 1—88—2670 cons.

Opinion filed May 25, 1990.

MURRAY, J., specially concurring.

Cecil A. Partee, State's Attorney, of Chicago (Bonnie Meyer Sloan, Special Assistant State's Attorney, and Inge Fryklund, Assistant State's Attorney, of counsel), for the People.

Sam Adam, of Chicago, for appellee.

JUSTICE LORENZ delivered the opinion of the court:

Rafael Menendez and Trinidad Garcia were indicted by a Cook County grand jury with possession of, and intent to deliver, a substance containing cocaine in violation of section 401(a)(2) of the Illinois Controlled Substances Act (Ill. Rev. Stat. 1985, ch. 56½, par. 1401(a)(2)). Prior to trial, Menendez successfully moved to suppress evidence seized from his luggage. The State now appeals.

We reverse and remand.

Summarized below are the pertinent facts adduced during the hearing on defendant's motion.

Amtrak police investigator Dennis Kroll testified that, in the course of investigating crimes for Amtrak, he would routinely examine manifests of trains arriving into Chicago. He explained that a manifest is a listing of all passengers on a train, from the city of origin to Chicago and all points en route. The manifest contains the pas-

senger's name, telephone number, reservation number, destination, and type of accommodations. Kroll stated he would focus upon sleeping compartment reservations because drug couriers typically reserved those accommodations to facilitate control over contraband.

Kroll explained that if the train manifest indicated a passenger arriving into Chicago had reserved a sleeping compartment, he would "bring up" the reservation on a computer located in his office. Using the computer, he could determine the date of the trip, when and in what manner the tickets were purchased, the type of accommodations, and the passenger's itinerary.

Kroll testified that on June 8, 1987, he examined the train manifest for Amtrak train number four, which was scheduled to arrive in Chicago that day at 2:55 p.m. from Los Angeles, California. The manifest indicated Trinidad Garcia was traveling with sleeping car accommodations. Kroll's further examination revealed that two passengers were traveling under Garcia's reservation, although defendant Menendez' name did not appear on the reservation.

The reservation was made on June 4, 1987, and was for a round trip from Los Angeles to New York. Kroll stated his examination disclosed the reservation had been cancelled four times on the same date it was made. The tickets were paid for in cash in the amount of $2,335. No telephone number was listed on the reservation. The itinerary indicated the passengers would be traveling for six days, spending three days in New York. Specifically, the passengers were scheduled to depart Los Angeles on train number four on Saturday, June 6, 1987, and would arrive in Chicago on June 8, 1987. Compartment A in that car was reserved for that leg of the trip. Separate compartments were reserved for travel between Chicago and New York. The passengers were to leave Chicago on June 8, 1987, arriving in New York the next day. Occupying separate compartments, they were to depart New York on June 12, 1987, arrive in Chicago on June 13, 1987, and leave that day for Denver, Colorado. Between Chicago and Denver the passengers were to occupy the same compartment. Still occupying the same compartment, the passengers were to depart from Denver on June 14, 1987, and arrive in Los Angeles on June 15, 1987, after a brief stop in Salt Lake City, Utah.

Kroll testified that, in observing the train's manifest, his suspicions were aroused because Garcia's reservation was made from a narcotics "source city," the reservation was made only two days prior to departure, the fare was paid for in cash, no telephone number was listed on the reservation, and the length of stay in New York was short in relation to time spent traveling.

Kroll alerted Tom Farri, his superior at Amtrak, who, in turn, notified the Chicago police and the Drug Enforcement Agency (DEA). At approximately 2 p.m. on June 8, 1987, Kroll testified, he met with DEA agent Norbert Kuksta, Chicago police officers Richard Boyle, Bob Balone, Tom Kissel, and others at Union Station in Chicago.

Shortly thereafter, Kroll, Balone, Boyle, and Farri boarded the train where it had been ordered stopped, approximately one mile away from Union Station.

Kroll testified he and Balone passed by compartment A, where he observed defendant and Garcia seated together on a bench. Kroll stated the train attendant informed him that at no time was compartment A left unoccupied, even during meals. Kroll passed that information on to Officer Boyle.

Officer Richard Boyle testified that upon the train's arrival in Union Station, he observed Garcia carry, from compartment A, a suitcase, a garment bag, and an attache case. Defendant carried two duffle bags. The luggage was loaded onto a cart by a porter. Boyle stated defendant walked on the train platform alongside the cart. Garcia followed approximately 50 feet behind. Boyle stated he was joined by Kuksta and Detective Richard Crowley and the three proceeded to the baggage-claim area, where he observed the porter unload the baggage cart. Boyle testified defendant took the two duffle bags. At that point, Boyle stated, he, Kuksta, and Crowley approached defendant and Garcia.

Agent Kuksta testified he, Boyle, and Crowley identified themselves as police officers. Kuksta stated they were dressed in plain clothes and did not display their weapons. Kuksta stated he told defendant and Garcia he wanted to ask them a few questions, but informed them they were under no requirement to cooperate. He stated defendant and Garcia agreed to answer his questions. Kuksta stated he examined both of the train tickets which Garcia had handed to him. Both tickets were in Garcia's name. Kuksta stated he asked Garcia why the same name appeared on both tickets and Garcia explained he had been invited by defendant to go on the trip and that defendant had given Garcia the money for the tickets. When Garcia purchased the tickets, he put both in his name.

At that time, Kuksta stated, defendant asked him what the officers' questioning concerned. Defendant was informed the officers were conducting a narcotics investigation and asked for defendant's cooperation, indicating it would only take a few minutes. Kuksta testified defendant and Garcia expressed agreement to cooperate. However, Kuksta stated, when informed of the nature of the investigation, defendant "became tense"; his hands trembled and he began to per-

spire. Garcia exhibited the same behavior. Both defendant and Garcia stated they were not transporting narcotics.

Kuksta testified Garcia consented to let Crowley search his luggage. Crowley then searched the attache case and suitcase, finding no contraband.

Officer Boyle testified that he then asked defendant for consent to search his luggage, explaining defendant was under no requirement to allow the search, was free to leave, and was not under arrest. Defendant asked if Boyle had a search warrant. Boyle stated he did not. Defendant declined to consent to the search of his luggage. Boyle testified he then informed defendant the luggage would be taken and subjected to examination by a trained dog for the presence of narcotics and that the examination would take approximately five minutes. Boyle acknowledged that he had told defendant that if the trained dog reacted positively to the bags, an attempt would be made to obtain a search warrant. The duffle bags and the garment bag were taken to where the trained dog was held by another officer and were placed alongside other "non-suspect" luggage. When the dog was allowed to sniff at the bags, the dog began to "bite and scratch" the two duffle bags, which, Boyle testified, indicated the presence of narcotics.

Agent Kuksta testified he waited with defendant while the bags were subjected to examination by the trained dog. Kuksta stated he informed defendant that, if the dog did not react positively, the luggage would be returned to him in Union Station if he was still there, or forwarded anywhere defendant wished. Kuksta stated both defendant and Garcia indicated an intention to continue with their travel and defendant indicated the bags should be sent to Grand Central Station in New York. Kuksta stated he then left defendant and Garcia alone in the train station.

Kuksta estimated approximately five to seven minutes had elapsed between the time defendant and Garcia had been approached by the officers until the time defendant's bags had been taken by Boyle and Crowley. During that time, Kuksta stated, the officers did not touch defendant or Garcia, nor did the officers otherwise physically restrict their movement and there were never more than three officers present.

After learning the trained dog had reacted positively, Kuksta went to where defendant and Garcia were and informed them of what had taken place. Kuksta advised defendant that the officers would attempt to secure a search warrant and would detain the bags. Kuksta gave defendant a receipt for the bags.

The bags were transported to police headquarters and a search

warrant subsequently granted. Based on the warrant, the bags were opened and 57 pounds of cocaine recovered.

In his own testimony, defendant, a 41-year-old architect, admitted he had agreed to speak to the officers when they approached him as he walked through Union Station. Defendant testified he did not consent to the search of his bags; the bags were taken from him by the officers. Defendant acknowledged that after the officers took the luggage from him, he continued about his business. Defendant conceded the officers spoke to him in a conversational tone, explained to him that he was not under arrest, did not have to speak with them, and was free to leave. Defendant also testified the officers informed him of the nature of the investigation and requested his cooperation, assuring him it would only take a few minutes. Defendant admitted he had agreed to cooperate. He stated approximately 20 minutes elapsed between the time the officers approached him and the time he declined to consent to the search of his bags. Defendant acknowledged one of the officers had indicated his luggage would be briefly detained and subjected to examination by a trained dog.

At that point, defendant's testimony becomes contradictory. At first, defendant acknowledged one of the officers again told him he was not under arrest and was free to leave. However, defendant also stated the officer "really didn't say anything," but indicated only that the luggage was being taken. Defendant testified he did not then know what the officers were going to do with the luggage and that the officers had not indicated the luggage would be detained for only a short time. Defendant stated he could not recall the officers telling him they would attempt to obtain a search warrant if the dog reacted positively to his luggage. Defendant testified the officers did not ask where the bags could be sent but, rather, told him they would send the luggage to Grand Central Station. That arrangement, defendant stated, was not at his request.

Defendant admitted, however, that after the officers took the bags, defendant and Garcia were left alone. He stated that about 20 minutes later an officer approached him and told him that the dog had reacted positively to his luggage and, consequently, the luggage would be detained. Defendant indicated to the officer that he was going to proceed on his way and he was allowed to leave. Defendant acknowledged the officers did not threaten him, touch him, handcuff him, or display their weapons.

After considering the testimony presented, the trial judge sustained defendant's motion to suppress evidence, stating:

"I believe that the seizure was without any articulable facts.

As to the suspicion developed by the agent, it seems to have come from computer print-outs of reasonable acts. I don't think one would want to travel from Los Angeles to New York without any grips. I think the grips were there reasonably. I think it was not consensual, so this was an unlawful seizure of bags, and subsequently the dog search becomes unreasonable, and the subsequent dog search was unreasonable."

OPINION

From the comments quoted above, we are unable to ascertain whether the first use of the term "seizure" refers to a "seizure" of defendant's person, when initially confronted by police, or to the detainment of defendant's bags. Similarly, we are unable to ascertain whether it was the initial encounter with police or the detainment of defendant's bags which the trial judge determined was not consensual. Therefore, we proceed to consider, in turn, whether the initial encounter between defendant and the narcotics officers was consensual, and whether the subsequent seizure and exposure of his luggage to a dog trained to detect narcotics violated defendant's fourth amendment rights.

In *Florida v. Royer* (1983), 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319, a plurality of the Supreme Court observed that "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." (*Royer*, 460 U.S. at 497, 75 L. Ed. 2d at 236, 103 S. Ct. at 1324.) In *People v. Jones* (1989), 190 Ill. App. 3d 416, 545 N.E.2d 1332, the facts of which in many ways parallel those presented in the instant case, we observed application of the above rule within the context of the questioning of a passenger disembarking from a train. We noted, in *Jones*, that "the test for determining whether a seizure has occurred is an objective one, namely, whether a reasonable person would have believed that he was free to leave under the circumstances." (*Jones*, 190 Ill. App. 3d at 421, 545 N.E.2d at 1335.) The test for determining whether an encounter is consensual also involves an analysis of the totality of the circumstances and is a matter which the prosecution has the burden of proving. *Jones*, 190 Ill. App. 3d at 422, 545 N.E.2d at 1335.

After reviewing the record before us, we conclude the initial encounter between defendant and the officers cannot be considered as

constituting a "seizure" for fourth amendment purposes. Defendant himself conceded that when approached by the officers in Union Station, he agreed to answer their questions. The record contains no testimony that the officers restricted defendant's movement in any way through physical contact or by words. There was no evidence that the officers ever threatened defendant, nor is there any indication that the officers displayed a weapon. Defendant admitted specifically being informed he was not under arrest and that he was free to leave. The record also indicates defendant understood he was under no obligation to speak to the officers but did so freely. Furthermore, defendant conceded he even agreed to cooperate with the officers after they had informed him that they were conducting a narcotics investigation. In the absence of such circumstances as might indicate a seizure of defendant's person occurred during initial questioning by the officers (see *United States v. Mendenhall* (1980), 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870), and given defendant's own testimony that he agreed to comply with the officers' request that he answer questions, we conclude the initial encounter between defendant and police was consensual.

■■ ■ We must next consider whether the detainment of defendant's luggage, arising out of the questioning of defendant, constituted a seizure of the luggage for purposes of the fourth amendment. In *United States v. Place* (1983), 462 U.S. 696, 77 L. Ed. 2d 110, 103 S. Ct. 2637, the Supreme Court held that where authorities possess specific and articulable facts warranting a reasonable belief that a traveler's luggage contains narcotics, the governmental interest in seizing the luggage briefly to submit the luggage to a "canine sniff" test is so substantial, and the test itself so unintrusive on fourth amendment liberties, that such detainment of luggage is not a seizure requiring probable cause. The question for us then becomes whether the officers in the instant case possessed specific and articulable facts, at the moment the officers took defendant's bags (see *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868), such as would justify detainment of defendant's luggage for submission to examination by a dog trained to detect narcotics. In that determination, the Supreme Court has recognized, applying principles relevant to determining whether probable cause exists, innocent behavior will frequently provide the basis for the requisite suspicion. (*United States v. Sokolow* (1989), 490 U.S. 1, 10, 104 L. Ed. 2d 1, 12, 109 S. Ct. 1581, 1587.) The proper inquiry is not whether particular conduct is innocent or guilty, " 'but the degree of suspicion that attaches to particular types of noncriminal acts.' " *Sokolow*, 490 U.S. at 10, 104 L.

Ed. 2d at 12, 109 S. Ct. at 1587, quoting *Illinois v. Gates* (1983), 462 U.S. 213, 243-44 n.13, 76 L. Ed. 2d 527, 552 n.13, 103 S. Ct. 2317, 2335 n.13.

■■ The record indicates the officers knew the following facts as of the time they first approached defendant in Union Station: the tickets had been paid for with cash; no telephone number was given in conjunction with the reservation; the reservation had been made only two days prior to departure; the reservation was repeatedly canceled on the same day it was made; the place of departure, Los Angeles, was considered to be a source city for narcotics; the passengers' itinerary consisted of almost twice as much travel time as time spent in New York; and the compartment in which the passengers traveled was never left unattended, even during meals. At Union Station, the officers learned from Garcia that defendant had given Garcia the money to pay for the tickets. Importantly, the officers observed that, when informed of the nature of their questioning, defendant became nervous; his hands trembled, and he started to perspire.

Any of the above facts would not, if isolated, indicate evidence of illegal conduct and might be consistent with innocent travel. However, we believe that when considered together, the existence of those facts would certainly justify the officers' suspicion that defendant's bags contained contraband such as would be sufficient to subject defendant's luggage to examination by a dog trained to detect narcotics.

Finally, we note the record discloses defendant's bags were subjected to examination by the trained dog within minutes of being taken by the officers and defendant was informed of the testing process as well as the procedure for the return of the luggage to him if the dog reacted negatively. See *People v. Forrest* (1988), 172 Ill. App. 3d 385, 526 N.E.2d 616.

Although we may disturb a trial judge's ruling sustaining a motion to suppress evidence only where the ruling was manifestly erroneous (see *People v. Long* (1983), 99 Ill. 2d 219, 457 N.E.2d 1252), we conclude reversal is warranted under the facts in the instant case.

Reversed and remanded.

COCCIA, P.J., concurs.

JUSTICE MURRAY, specially concurring:

I concur in the majority opinion. Illinois and the law as enunciated by the United States Supreme Court and the majority in this case mandate a reversal of the trial court's ruling. If this case involved

stolen diamonds, laundered money, or other material instead of drugs, case law would have mandated an affirmance. Rather than skirting around the bush, we should label this and other cases involving the search and seizure of drug-bearing luggage from interstate travelers as "the drug exception to the constitutional right against unreasonable search and seizures."