THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JERRY STODDARD, Defendant-Appellant.

First District (6th Division) No. 1—91—0622

Opinion filed November 5, 1993.

990

Michael J. Pelletier, of State Appellate Defender's Office, and M. Jacqueline Walther, of Kielian & Walther, both of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Theodore F. Burtzos, and Susan R. Schierl, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN delivered the opinion of the court:

This is a "drug courier profile" search and seizure case. The defendant was arrested on October 25, 1989, at Union Station in Chicago by police officers assigned to drug enforcement. A search of his luggage disclosed cocaine. He was charged with possession of a controlled substance with intent to deliver and trafficking in a controlled substance. His motion to quash arrest and suppress evidence was denied. After a bench trial, he was found not guilty of trafficking

and guilty of possession with intent to deliver and sentenced to 15 years' imprisonment. He contends that the trial judge erred in denying his motion to suppress.

On October 25, 1989, Officers Thomas Martin and Thomas Kinsella were detailed to the Drug Enforcement Task Force of the Chicago police department. Both were in civilian clothes and not visibly armed. Martin monitored passengers from certain inbound trains, looking for couriers of controlled substances. Martin, Kinsella and Amtrak Agent Fedorcak first saw the defendant as he disembarked from a train from Los Angeles, a "source" city for narcotics distribution. This train had made 30 stops en route to Chicago. Some of the stops, but not all, were made in source cities.

Martin saw that the defendant was the last passenger to exit from the sleeper car. The defendant was dressed in a jacket, shirt and regular slacks and carried a small black suitcase and a black leather handbag. The defendant looked around as though he was "looking for somebody."

The defendant approached a porter and placed his bags on the top shelf of the porter's cart. As the defendant walked to the main part of the station, Martin continued to observe him. The defendant walked immediately alongside his luggage. Kinsella thought it unusual that the defendant walked alongside his luggage and did not let it out of his sight. The defendant also looked over his shoulder.

After passing through glass doors, the defendant took his luggage from the cart and began to exit. Martin and Fedorcak approached the defendant. Martin identified himself as a Chicago police officer and showed him identification. Martin asked the defendant if he would mind speaking with him. The defendant replied that "there was no problem" and that he would speak with Martin. Martin told him in a conversational tone that he was "free to leave, that he was not under arrest, that this was just a conversation of an investigative nature." The entire questioning occurred in a public place with approximately 100 to 200 people in the vicinity. At no time did any officer block the defendant's path, and no more than two officers spoke with the defendant at one time.

Martin learned that the defendant boarded the train in Flagstaff, Arizona, another "source" city, and had been on the train two days. Martin asked the defendant for identification. The defendant produced his birth certificate and his train ticket. The ticket was purchased with cash in the amount of $260. When Martin asked why he was travelling, the defendant responded that he was "conducting business and vacation combined," he was involved in pinball franchising. Martin also learned that the defendant had upgraded

his ticket to a sleeper car for $116; he again paid cash. Martin testified to the significance "in drug surveillance" of paying with cash and upgrading to a sleeper car. Cash payment is preferred because it leaves no record that the individual has travelled or left town. Upgrading to a sleeper gives the traveller more control over his luggage. Martin acknowledged that it is common for many people to pay cash for their tickets. Martin did not explain the significance of "upgrading," that is, he did not explain what difference there would be if the defendant had originally paid for a sleeper. According to Martin, when the defendant produced his birth certificate, he was "physically trembling, his hands were shaking. He was physically very nervous." Kinsella then approached and Agent Fedorcak withdrew from the conversation. Later, Officer Crowley joined them. The birth certificate that the defendant produced bore his own name. When Kinsella asked for further identification, the defendant stated that he had lost his wallet at the Los Angeles airport and that his California driver's license and identification were in the wallet. The defendant had previously said that he resided in Phoenix, Arizona. Kinsella also asked him if he reported the loss of his wallet to the police. The defendant first said he had not and then said that he told the policeman on duty there, but that he did not know if the policeman made a report on it. In response to further questions by Kinsella, the defendant said that he packed his own bags and that no one had given him any other packages. At this time, the defendant was "shaking" and "physically trembling."

At about 5 p.m., Officer Kinsella told the defendant that his bags "would be detained and that a narcotic detective dog would *** sniff the bags for any indication of a controlled substance. *** [I]f the dog didn't make a positive alert," the defendant would be given his bags back. Kinsella told the defendant that the dog sniff would not take more than 10 minutes. The officers learned that the defendant was catching a connecting train to Detroit at 5:50 p.m. Both officers told the defendant that he was not under arrest and he was free to leave at this time. The defendant stated that he would wait in the train station for his connecting train. The dog sniff took 10 minutes, and the dog reacted positively.

Officer Kinsella testified that the defendant looked around the entire area as he stepped off the train. He was walking in the direction of the glass doors leading to the main terminal building from the platform and looked back over his shoulder a couple of times as he was walking. Kinsella summarized what he thought appeared unusual about the defendant to warrant questioning him:

"The fact that he put the bags on top of the baggage cart and

walked right alongside of them, that he did not leave them alone or let them out of his sight at all. The manner in which he was dressed was not indicative of a business person making a business trip. He wasn't dressed in a three-piece suit, he was dressed in casual clothing."

Kinsella admitted that he did not know whether the defendant was a businessman until after he questioned him.

After arguments, the judge denied the motion to quash arrest and to suppress. The defendant waived his right to a jury trial. Officer Martin's testimony at trial was substantially the same as his testimony at the motion to suppress evidence. In addition, Martin testified that he took the defendant's three pieces of luggage to a conference room at the Amtrak offices for the dog "sniff." Martin put the luggage in three different spots in the room. Kinsella told the certified narcotics dog, Rex, to "fetch dope," and the dog scratched and bit all three bags. At 9 p.m., Martin executed a search warrant and found six kilograms of cocaine in the hard-sided case. According to Martin, the street value of the 96% pure cocaine was $1.6 million.

The defense introduced no evidence. The judge then found the defendant guilty of possession with intent to deliver and not guilty of trafficking.

■ As a threshold matter, it is appropriate that we address the defendant's argument that this intermediate court should reject the "lockstep doctrine" in search and seizure cases and hold that we are not bound to follow United States Supreme Court precedent in determining whether section 6 of the Illinois Constitution has been violated. In support of that argument the defendant has cited *People v. DiGuida* (1992), 152 Ill. 2d 104, 604 N.E.2d 336. In *DiGuida* the Illinois Supreme Court concluded that the free speech protection of the Illinois Constitution was broader than the free speech protection of the Federal Constitution. In making that holding, however, the *DiGuida* court distinguished the free speech provisions of the Federal Constitution and section 6 of the Illinois Bill of Rights (Ill. Const. 1970, art. I, § 6), which proscribes illegal searches and seizures. The court cited with approval *People v. Hoskins* (1984), 101 Ill. 2d 209, 461 N.E.2d 941, in which the supreme court had previously held that it would interpret section 6 of the Illinois Bill of Rights in the same way that the United States Supreme Court had interpreted the fourth amendment. Consequently, we must reject the defendant's argument.

The next step in our analysis requires that we determine the proper standard on review. The defendant argues in his reply brief that we must consider the issues *de novo* and cites *People v. Foskey* (1990), 136 Ill. 2d 66, 554 N.E.2d 192. We have recently addressed the

same question in *People v. Hendrix* (1993), 250 Ill. App. 3d 58, but in the context of probable cause to arrest. We discussed *Foskey* and *In re D.G.* (1991), 144 Ill. 2d 404, 581 N.E.2d 648, which cited *Foskey* and which held that where neither the facts nor credibility of the witnesses is contested, the issue of whether probable cause exists is a legal question which a reviewing court may consider *de novo*. We referred to several previous supreme court opinions which held that a reviewing court may not disturb a finding that the police had probable cause to arrest unless the finding was manifestly erroneous. (*People v. Evans* (1988), 125 Ill. 2d 50, 530 N.E.2d 1360; *People v. Foster* (1987), 119 Ill. 2d 69, 518 N.E.2d 82; *People v. Cabrera* (1987), 116 Ill. 2d 474, 508 N.E.2d 708; *People v. Clay* (1973), 55 Ill. 2d 501, 304 N.E.2d 280.) In *Evans* and *Foster* the facts and credibility of the witnesses were not disputed. We pointed out that *Foskey* did not involve the issue of probable cause; the court expressly found that probable cause existed. The issue in *Foskey* was whether exigent circumstances existed which would justify the warrantless arrest of a defendant in his home.

We also referred to *United States v. Spears* (7th Cir. 1992), 965 F.2d 262, in which the court of appeals pointed out that in *Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317, the Supreme Court held that review of the sufficiency of affidavits supporting an application for a search warrant should not be made *de novo*. The *Spears* court reasoned that there was no basis for different rules in nonwarrant cases and warrant cases and that appellate review should be the same for both. We concluded that the reasoning of the *Spears* court was sound and that the greater weight of Illinois Supreme Court precedent supported the view that review of a trial judge's finding of probable cause in a nonwarrant case is to be made under a clearly erroneous standard and not a *de novo* standard. That being so, we concluded that some deference is to be given to the views of the trial judge who passes on the question of whether probable cause existed to effect an arrest.

■ In many of the cases involving drug courier seizures the appellate court decided the case under a manifestly erroneous standard (*e.g., People v. Jones* (1989), 190 Ill. App. 3d 416, 545 N.E.2d 1332) or a manifest weight of the evidence standard (*e.g., People v. Menendez* (1990), 199 Ill. App. 3d 612, 557 N.E.2d 462). In *Jones* the testimony of the police officer was unrebutted. In *Menendez* the testimony of the police officer was rebutted in part, but not the testimony of the officer concerning the facts upon which they based a reasonable suspicion. We see no reason why there should be a different standard on review in determining whether probable cause

for an arrest existed and whether the police had reasonable suspicion that would justify the detention of luggage. In *United States v. Sokolow* (1989), 490 U.S. 1, 104 L. Ed. 2d 1, 109 S. Ct. 1581, a drug courier profile case, the Supreme Court held that the principles applicable to determination of probable cause are also applicable to determination of "reasonable suspicion." *Sokolow*, 490 U.S. at 10, 104 L. Ed. 2d at 12, 109 S. Ct. at 1587; see also *United States v. Adebayo* (7th Cir. 1993), 985 F.2d 1333, 1337 n.2.

The reports of State courts and Federal courts throughout the nation abound with opinions dealing with drug courier searches. Those opinions are often difficult to reconcile. A trial judge (as well as a reviewing court judge) has a hard choice in deciding which cases to follow. Consequently, we believe that some deference should be made to the judgment made by the trial judge. For these reasons, we will adhere to the views expressed in *Hendrix* and review this case under the clearly erroneous standard.

■ We agree with the defendant that the police did not have sufficient evidence to justify an investigatory *Terry* stop. (*Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868.) But we do not agree with the defendant that the original encounter between the police and the defendant was a *Terry* stop or a seizure of the defendant's person. The trial judge found it to be a consensual encounter, and we agree. There was no evidence of coercion on the part of the police; the unrebutted testimony was that the police officers told the defendant he was free to leave and that he was not under arrest. When the officers asked if they could speak to the defendant, he said it was "no problem" and that he would speak to them. The trial judge's conclusion that it was a consensual encounter was not clearly erroneous. See *People v. Breeding* (1991), 219 Ill. App. 3d 590, 579 N.E.2d 1128; *People v. Statham* (1991), 209 Ill. App. 3d 352, 568 N.E.2d 183.

The next issue is whether the police officers were justified in the seizure of the defendant's luggage. In *United States v. Place* (1983), 462 U.S. 696, 77 L. Ed. 2d 110, 103 S. Ct. 2637, the Supreme Court held that the detention of luggage for purposes of investigation must be justified by a reasonable suspicion based on specific articulable facts that the luggage contains contraband. The facts used to support such an investigatory detention are insufficient when they describe "a very large category of presumably innocent travelers, who would be subject to virtually random seizures." (*Reid v. Georgia* (1980), 448 U.S. 438, 441, 65 L. Ed. 2d 890, 894, 100 S. Ct. 2752, 2754.) In determining whether a reasonable suspicion exists, the court must consider the totality of the circumstances. *United States v. Sokolow* (1989), 490 U.S. 1, 104 L. Ed. 2d 1, 109 S. Ct. 1581.

Both parties have cited several cases in support of their positions. We have previously discussed many of those cases in *People v. Breeding* (1991), 219 Ill. App. 3d 590, 579 N.E.2d 1128, in which we reversed an order denying a motion to suppress evidence. Not surprisingly, the cases differ factually in varying degrees from each other and from this case. We judge that no case cited is factually controlling and that this case must be decided on its own facts. This is not to say that we must ignore all the other cases and the facts upon which they were decided.

As we previously noted, those cases are often difficult to reconcile. To illustrate, in *People v. Nelson* (1989), 188 Ill. App. 3d 619, 544 N.E.2d 1111, the appellate court affirmed an order suppressing evidence. The defendant had paid cash for his one-way train ticket; he had cancelled his reservations a number of times; he told the officer he had boarded the train in Washington D.C., but his ticket showed that he had boarded in Florida; he became nervous and began to stutter; he looked around as though scanning the crowd for surveillance; and he told the officers he had once been arrested for possession of marijuana.

But in *People v. Menendez* (1990), 199 Ill. App. 3d 612, 557 N.E.2d 462, the appellate court reversed the suppression order although, in our judgment, the evidence supporting a reasonable suspicion was weaker than the evidence in *Nelson*, because the defendant did not make any untruthful or suspicious answer as the defendant did in *Nelson*. In *Menendez*, the defendant's train ticket was paid for with cash; no telephone number was given in conjunction with the reservation; the reservation had been made only two days prior to departure; the reservation was repeatedly cancelled on the same day it was made; the place of departure, Los Angeles, was considered to be a source city for narcotics; the defendant's itinerary consisted of almost twice as much travel time as time spent in New York, the defendant's destination; and the compartment in which the defendant travelled with another person was never left unattended, even during meals. To those facts, the appellate court added:

> "Importantly, the officers observed that, when informed of the nature of their questioning, defendant became nervous; his hands trembled, and he started to perspire." *Menendez*, 199 Ill. App. 3d at 620.

What the *Menendez* court considered important, the defendant's outward display of nervousness, was deprecated in other cases. See *People v. Boyd* (1991), 215 Ill. App. 3d 894, 576 N.E.2d 116; *People v. Reed* (1967), 37 Ill. 2d 91, 227 N.E.2d 69; *People v. Steckhan* (1983), 116 Ill. App. 3d 173, 452 N.E.2d 122; *People v. Kiser* (1983), 113 Ill.

App. 3d 501, 447 N.E.2d 858; *People v. DeLisle* (1982), 104 Ill. App. 3d 297, 432 N.E.2d 954.

In *Breeding* we cautioned that testimony that a defendant appeared nervous, a subjective interpretation by the officer, was beyond contradiction by the defendant. To that observation we add that too much reliance on such evidence may lead to encouragement of boiler plate testimony. We note that in this case Officer Kinsella testified that the defendant was "shaking, physically trembling." In *DeLisle*, Kinsella testified that the defendant was "nervous and visibly shaking." (*DeLisle*, 104 Ill. App. 3d at 298.) In *Kiser*, Kinsella testified that the defendant was "nervous and shaking during questioning." (*Kiser*, 113 Ill. App. 3d at 506.) In *People v. Ohlinger* (1989), 185 Ill. App. 3d 763, 765, 542 N.E.2d 382, 384, Kinsella testified that the defendant's "hands were shaking and that his stomach was trembling."

When we decided *Breeding* we said that we had not found any case which upheld the seizure of luggage solely on the basis of the mannerisms of the defendant which were accompanied by truthful answers or other innocent behavior. (*Breeding*, 219 Ill. App. 3d at 601.) At the time *Breeding* was written, we were unaware of *Menendez* or *People v. Jones* (1989), 190 Ill. App. 3d 416, 545 N.E.2d 1332. In *Jones*, the police stopped the defendant and his fellow passenger and ultimately seized the defendant's luggage. The officers relied on the following facts: The defendant repeatedly made "eye contact" with the officers in the train station; the defendant's travel itinerary indicated he had flown to Ft. Lauderdale from Midway Airport in Chicago on March 26, and that he left Ft. Lauderdale on March 29 on a train to Chicago; and the defendant appeared nervous when questioned. He did not make any untruthful or suspicious answers. A divided appellate court affirmed an order denying the motion to suppress, but we note that the holding in *Jones* is obscured by the fact that before the officers actually seized the defendant's luggage he told them that he had narcotics in the luggage but was carrying it for someone else. The appellate court concluded that that statement gave the officers probable cause to search the luggage. We note that *Jones* was written by the same judge who later made the following observation in *Menendez* in a special concurrence:

"If this case involved stolen diamonds, laundered money, or other material instead of drugs, case law would have mandated an affirmance [of the suppression order]. Rather than skirting around the bush, we should label this and other cases involving the search and seizure of drug-bearing luggage from interstate travelers as 'the drug exception to the constitutional right against unreason-

able search and seizures.' " *Menendez*, 199 Ill. App. 3d at 620-21 (Murray, J., specially concurring).

We respectfully conclude that *Menendez* does not represent the majority view of the Illinois Appellate Court, and we adhere to the views expressed in *Breeding*.

■ In our judgment, little weight should be given to the evidence that the defendant was dressed in casual clothes, that he continued to watch his luggage while it was being transported by the porter and that he was the last person to leave the train. Compare *United States v. Millan* (8th Cir. 1990), 912 F.2d 1014, (significant that the defendant was the first to deplane), with *United States v. Mendenhall* (1980), 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870 (significant that the defendant was one of the last to deplane).

We recognize that we must give deference to the expertise of the police officers (*United States v. Cortez* (1981), 449 U.S. 411, 66 L. Ed. 2d 621, 101 S. Ct. 690), "but the fact that an officer is experienced does not require a court to accept all of his suspicions as reasonable, nor does mere experience mean that an agent's perceptions are justified by the *objective* facts." (Emphasis in original.) *United States v. Buenaventura-Ariza* (2d Cir. 1980), 615 F.2d 29, 36.

We must consider the officers' testimony that the defendant's payments in cash were significant. (*United States v. Sokolow* (1989), 490 U.S. 1, 104 L. Ed. 2d 1, 109 S. Ct. 1581.) We must also consider their testimony of the significance of the defendant's use of a sleeper. Notably, these facts were absent in *Breeding*.

We acknowledge that the United States Supreme Court has recognized that the fact the defendant has left from a source city is probative. We caution, however, that the weight of the evidence that a city is a source city for narcotics is limited. See *United States v. Andrews* (6th Cir. 1979), 600 F.2d 563; *Breeding*, 219 Ill. App. 3d at 601.

In our judgment, this case hinges on the following evidence which the State emphasizes: (1) when asked to produce some identification, the defendant produced his birth certificate; (2) the defendant informed the officers that he resided in Phoenix, Arizona, but later told the officers he possessed a California driver's license; (3) the defendant told the officers that he lost his wallet in the Los Angeles airport; he first said that he did not report the loss; then he told the officers that he did report the loss to a police officer at the airport, but he was unsure whether the officer took down the information. We agree that these facts may be susceptible of innocent interpretations; but they are unusual. Indeed, the fact that the defendant had a birth certificate on his person for identification purposes is most unusual. We judge that a police officer would be justified in concluding

that a reasonable person would make a formal report of the loss of a wallet and would notify someone at the Los Angeles airport of where he could be located in the event the wallet was found. A reasonable person would not adopt the seemingly care-free attitude toward the loss of his wallet that the defendant did. The officer might also reasonably conclude that the defendant's answers were contradictory. The officer would also be justified in being suspicious when told that the defendant resided in Phoenix, Arizona, but possessed a California driver's license. (*Cf. United States v. Nurse* (D.C. Cir. 1990), 916 F.2d 20; *United States v. Sterling* (7th Cir. 1990), 909 F.2d 1078.) The suspicious answers given by the defendant provide a strong distinction in this case from the facts in *Breeding*.

In *United States v. Sokolow* the Supreme Court held that in evaluating reasonable suspicion, a court must consider the totality of the circumstances rather than isolate each fact separately. It is not the function of a reviewing court to impose its own personal views on the sufficiency of the evidence. Our function is to determine whether the trial judge's determination was clearly erroneous. When we consider the totality of the facts which were before the trial judge, we conclude that we cannot say that the trial judge's determination was clearly erroneous. The order denying the motion to suppress and the judgment of conviction are affirmed.

The defendant contends that the trial judge should have permitted him to elect under which sentencing scheme he would be sentenced. The crux of the defendant's argument is that the sentencing scheme in effect at the time the defendant committed the crime had been repealed by the time he was sentenced.

■ The issue is whether the amendment in the sentencing scheme affected the sentence that the defendant received. An analysis of the amended statute indicates that the defendant would have received the same sentence under the 1989 scheme, when the crime was committed, or under the amended scheme in 1990, when he was sentenced. The defendant's argument has been rejected in *People v. Cox* (1992), 225 Ill. App. 3d 620, 588 N.E.2d 400. Contrary to the defendant's argument, we conclude that *Cox* was correctly decided.

On October 25, 1989 (when the offense was committed), the sentencing scheme for delivery of 900 grams or more of cocaine was 15 to 60 years. Section 401 of the Illinois Controlled Substances Act prescribed a Class X felony for categorically scaled amounts of various drugs:

"Except as provided in Section 401.2, any person who violates this Section with respect to:

(a) the following amounts of controlled *** substances *** is guilty of a Class X felony. ***

***

(2) 15 grams or more but less than 100 grams of any substance containing cocaine, or an analog thereof[.]" Ill. Rev. Stat., 1988 Supp., ch. 561/2, par. 1401.

If an offender was convicted with a greater amount than 100 grams of cocaine, he was sentenced under the "Super Class X" provision, found at section 401.2, which provided:

"Any person who violates paragraph *** (2), *** of subsection (a) of Section 401 with respect to the following amounts of controlled *** substance *** is guilty of a Class X felony and shall be sentenced to a term of imprisonment as follows:

(1) not less than 9 years and not more than 40 years with respect to 100 grams or more but less than 400 grams;

(2) not less than 12 years and not more than 50 years with respect to 400 grams or more but less than 900 grams;

(3) not less than 15 years and not more than 60 years with respect to 900 grams or more;

(4) any person with respect to paragraph (1), (2) or (3) above may be fined an amount not more than the full street value of the controlled *** substance ***." (Ill. Rev. Stat., 1988 Supp., ch. $56^{1}/_{2}$, par. 1401.2.)

In this case, the defendant was convicted of possession with intent to deliver 6,002.5 grams of cocaine. Under the statute (paragraph (3)) in effect in 1989, he could be sentenced from 15 to 60 years.

The 86th General Assembly passed three consecutive bills that amended the Illinois Controlled Substances Act (the Act). (Pub. Acts 86—266 (1989 Ill. Legis. Serv. 1789), 86—442 (1989 Ill. Legis. Serv. 2458), 86—604 (1989 Ill. Legis. Serv. 2971).) The three bills became effective on January 1, 1990. The defendant was sentenced on November 19, 1990.

The inquiry, therefore, centers upon the effect of these three amendatory bills on the "Super Class X" provision of the Act. On June 15, 1989, Public Act 86—442 was passed. It amended the Act by repealing the "Super Class X" provisions and incorporating them into section 401 of the Act. Thereafter, the Senate passed Public Act 86—266, identical to 86—442, on June 19, 1989. The sentencing provisions were merely moved to another section of the Act; the provisions continuously remained in effect. The same sentencing scheme, under which the defendant was sentenced in 1990, was now located in section 401(a)(2)(D). Ill. Rev. Stat., 1990 Supp., ch. $56^{1}/_{2}$, par. 1401(a)(2)(D).

On June 27, 1989, the Senate passed Public Act 86—604. This amendment merely altered the provision pertaining to the drug LSD (section 401, paragraphs (7)(i) and (ii)). This amendment did not set

forth the entire text of changes to section 401 that were passed in Public Acts 86—266 and 86—442. Based on this omission of the "Super Class X" sentencing scheme, the defendant argues that the legislature impliedly repealed the sentencing scheme for the categories that exceeded 100 grams of cocaine and other controlled substances.

In 1990, the sentencing scheme for possession with intent to deliver over 100 grams was provided for in paragraph (a)(2)(D) of section 401. The sentencing scheme was never impliedly repealed because the sentencing scheme was merely moved to another section (from section 401.2 to section 401). The defendant claims that the omission of the sentencing scheme from the last amendment (Pub. Act 86—604, eff. January 1, 1990) meant that the sentencing scheme was no longer in effect and that the possession of over 100 grams was no longer an offense. As the State correctly notes, this argument would create an absurdity. *People v. Steppan* (1985), 105 Ill. 2d 310, 473 N.E.2d 1300 (cannot presume that legislature, in passing legislation, intended absurdity, inconvenience, or injustice).

Under the rules of statutory construction, the defendant's argument must be rejected. If two enactments are capable of being construed so that both may stand, the court should so construe them. (*People v. Ullrich* (1990), 135 Ill. 2d 477, 553 N.E.2d 356.) The first two amendments (Public Acts 86—442 and 86—266) transferred the "Super Class X" sentencing scheme to section 401 of the Act. Public Act 86—604 merely added a provision regarding the drug LSD without restating the changes from Public Acts 86—442 and 86—266. It is noteworthy that all three acts were passed in the same legislative session of the 86th General Assembly and that the last amendment was passed only eight days after the first two amendments. As the State correctly points out, all three amendatory bills were passed contemporaneously and the last bill, according to the floor debate, only changed the LSD provisions; it did not alter the sentencing scheme that was moved to section 401. The State makes clear that this "omission" frequently happens in the legislature when it amends existing law. When two amendments to the same section are adopted at a single session of the General Assembly, the repetition in each bill of existing law, which that particular bill does not change, will give rise to a surface inconsistency. *Apex Motor Fuel Co. v. Barrett* (1960), 20 Ill. 2d 395, 169 N.E.2d 769.

The Statute on Statutes, in part, provides:

"Two or more Acts which relate to [the] same subject matter and which are enacted by the same General Assembly shall be construed together in such manner as to give full effect to each

Act except in case of an irreconcilable conflict. In case of an irreconcilable conflict the Act last acted upon by the General Assembly is controlling to the extent of such conflict. ***

An irreconcilable conflict between 2 or more Acts which amend the same section of an Act exists only if the amendatory Acts make inconsistent changes in the section as it theretofore existed." (Ill. Rev. Stat. 1989, ch. 1, par. 1105.)

All three amendatory acts were enacted by the same General Assembly and can be read consistent with each other. There is no irreconcilable conflict created by Public Act 86—604. The sentencing scheme, therefore, remained in effect and was not "impliedly" repealed as the defendant contends.

For these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA, P.J., and RAKOWSKI, J., concur.